[Civ. No. 21910.    First Dist., Div. One.    Mar. 22, 1965.]

R. H. MYERS, Plaintiff and Respondent, v. LEE STEPHENS et al., Defendants and Appellants.

Ring, Turner & Ring and H. E. Barker, Jr., for Defendants and Appellants.

Pelletreau, Gowen, Moses & Porlier and J. Vance Porlier for Plaintiff and Respondent.

MOLINARI, J.—Defendants Lee Stephens and Ferrol Development Company appeal from a judgment, after a court trial, awarding plaintiff damages in the sum of $3,040. The case was tried, and judgment was entered, upon a conversion theory based on the sale by defendants of personal property which they had allegedly previously sold to plaintiff.

### Questions Presented

1. Did plaintiff and defendants enter into a valid and enforceable contract of sale on November 14, 1962, so as to give plaintiff a cause of action in conversion against de-

fendants who "resold" the same property to a third person on November 15, 1962?

2. Was plaintiff entitled in his conversion action to recover damages based on his loss of profits from his anticipated resale of the house?

## The Record

On November 14, 1962, Ferrol Development Company had for sale a single-unit residence located at 2879 Melillo Drive in Walnut Creek. Several months previous to this date, defendant Lee Stephens, president of the Ferrol Development Company, had contacted defendant Vernon Erickson,[1] a real estate broker, and informed him to "go ahead and sell it." About two weeks prior to November 14, 1962, Erickson telephoned plaintiff and told him "we had a house . . . that we wanted to get moved off."

On November 14, 1962, plaintiff called on Erickson and made an offer to purchase the house for $250, stating that he would need some time to move it off—somewhere in the neighborhood of from 30 to 60 days. Erickson responded that he would have to call the owner " 'and find out if he'd take that. . . .' " Erickson then, in plaintiff's presence, telephoned Stephens and informed him of plaintiff's offer. According to Erickson's testimony Stephens responded that "he couldn't wait that long. He wanted to get it off right now. . . . He more or less turned that down unless I could get something better." And Stephens himself testified as to his conversation with Erickson as follows: "I told Vern that the price, the $250 was immaterial to me, but I needed the house moved off faster than that, that that was not acceptable . . . that if he could sell the house and improve on the time, fine. What I was primarily interested in was getting the house off as soon as possible." Stephens further testified that in his mind when the telephone call ended the house was not sold.

After the telephone conversation with Stephens had ended, plaintiff and Erickson continued their conversation. Erickson inquired as to how long it would take to move the building. Plaintiff responded that he "felt the building could be moved out of there within thirty days" and that within 10 days he "could give him the actual moving date." Erickson stated "that that was acceptable" and wrote out a receipt, which he signed, stating that the sum of $250 was received from

---

[1]The trial court found that Erickson was not a party to the conversion. The record does not disclose whether judgment was entered in his favor. In any event he is not a party to this appeal.

R. H. Myers "For house at 2879 Melillo Dr., Walnut Creek. To be moved off property—Buyer will give a definite move off date in 10 days." Plaintiff then gave Erickson the check for $250.[2]

Immediately following November 14, 1962, plaintiff, who apparently believed that the deal had been closed, commenced preliminary work on the house for the purpose of preparing it for removal. Meanwhile, on November 15, 1962, Stephens, who had not yet been informed by Erickson that he had accepted the $250 from plaintiff and had given him a receipt therefor, sold the house directly to one Tost for $1.00, the deposit receipt stating that the house was to be moved within 15 days.

At the trial, plaintiff introduced evidence relating to the profit which he had anticipated from the resale of this house. He testified that it would have cost him approximately $8,000 to move the house and get it in a condition for resale, that the lot which he anticipated using as the site for the house would cost $4,000, and that the value of the house when relocated would be about $17,000, thus netting him a profit in the amount of approximately $5,000 to $6,000. Plaintiff also introduced the testimony of an appraiser who stated that the value of the relocated house would be $16,950 to $17,250. Defendants' counsel entered a timely objection to the introduction of this whole line of testimony as being immaterial and irrelevant. Defendants took the position that the appropriate measure of damages was the fair and reasonable value of the house, which was admitted by the pleadings to be $250.

*Was a Sale of the House Consummated on November 14, 1962?*

Since the gist of plaintiff's complaint was an action in conversion, it was incumbent upon him to prove ownership of the house in himself on November 15, 1962.[3] (See *Schweitzer* v. *Bank of America*, 42 Cal.App.2d 536, 544 [109 P.2d 441]; *Metropolitan Life Ins. Co.* v. *San Francisco Bank*, 58 Cal. App.2d 528, 534 [136 P.2d 853].) Based upon the evidence adduced at the trial, the court below found that the property was sold to plaintiff on November 14, 1962, and that de-

---

[2]Erickson testified that the check was tendered and received as a deposit on the house.

[3]Under the Uniform Sales Act, which was the law in California in 1962 when the transactions herein involved took place, the remedy of conversion was available to the buyer "Where the property in the goods has passed to the buyer" (former Civ. Code, § 1786); and pursuant to Civ. Code, §§ 1738 and 1739 (rule 1), as they then provided, the property in the house passed when the contract was made.

fendants converted the same to their own use when they sold it to a third party on November 15, 1962. On this appeal defendants contend that a sale of the house was not made on November 14, 1962 on two grounds: (1) that a contract was not entered into because plaintiff's tender was nothing more than an offer which was not accepted by defendants; and (2) that in any event, Erickson, as defendants' agent, exceeded his authority.

In both the original and amended complaints plaintiff alleged that the agreement of sale between the parties consisted of the subject receipt. This also appears to be the theory upon which plaintiff proceeded initially at the trial. In the course of the trial evidence was adduced by both sides as to the circumstances and conversations leading up to and surrounding the execution of the receipt. Objections were not interposed or urged that there was any violation of the parol evidence rule. In its findings the trial court did not make a specific finding as to whether the agreement of sale consisted of the subject receipt or whether it consisted of an oral agreement, but merely found that defendants "sold" the subject house to plaintiff. In his brief on appeal plaintiff does not urge or contend that the subject receipt constituted the agreement of sale but merely asserts that "whether there was a completed sale or not is a question of fact."[4] In the light of the record and the posture in which each side presented its case, it is apparent that the trial court and the litigants proceeded on the theory that the issue to be determined was whether an oral contract of sale was entered into between the parties. Insofar as the subject receipt is concerned, it appears to have been treated as a mere receipt and not as a binding agreement constituting an exclusive memorial.

Adverting to the record we find plaintiff testified that after Stephens rejected his offer to remove the house within the period of 30 to 60 days, plaintiff proposed to Erickson that he could move the house within 30 days and that within 10 days he would advise Erickson of the actual moving date. Plaintiff testified further that Erickson accepted this offer and that the latter thereupon drew up the receipt.[5] Although this evidence was in conflict with Erick-

---

[4]This statement is followed with the assertion that "The trial Court made its finding in favor of respondent and such finding will not be disturbed on appeal if supported by any substantial evidence."

[5]His statements in this respect appear in several portions of his testimony both on direct and cross-examination. On direct examination he testified as follows: ". . . I told him that I felt the building could be

son's testimony that the tender of $250 was merely a deposit and that plaintiff's proposal was subject to Stephens' approval, the trial court was justified, under well-established principles, in accepting plaintiff's version of the conversation and rejecting Erickson's. The trial court was also justified, as the trier of the facts, to weigh and reject the testimony of Erickson's coemployee, Thomas Jensen, who overheard the tail end of the conversation between plaintiff and Erickson, and who testified that he heard Erickson say, " 'We think we've got a deal. . . . If Lee [Stephens] takes . . . If Lee O.K.'s this time limit bit we're on our way to a sale' . . . .' '

Reconciling plaintiff's testimony with that of Stephens, who testified that the time limit for moving the house of from 30 to 60 days originally proposed by plaintiff was not acceptable to him, that he "needed the house moved off faster than that," and that he told Erickson in the telephone conversation "that if he could sell the house and improve on the time, fine," and considering Erickson's testimony that Stephens turned plaintiff's original offer down "unless I could get something better," the trial court was entitled to infer that Erickson was authorized to accept an offer which cut the moving-off time to within 30 days. The trial court was also entitled to consider the receipt in arriving at the intention of the parties. ■ A mere receipt is in the nature of an admission that money or property has been received. (*Haidinger-Hayes, Inc.* v. *Marvin Hime & Co.*, 206 Cal.App.2d 46, 51-52 [23 Cal.Rptr. 455].) As such it is not a written instrument the terms of which cannot be contradicted by parol,

moved out of there within thirty days, but certainly within ten days' time I could give him a definite move date. . . . And I told him that within ten days I could give him the actual moving date."

On cross-examination he stated: "I said, 'Well, I can pinpoint the time element if you will agree for—let me set a move date within ten days.' . . . And I said, 'I can pinpoint this move in a matter of ten days.' He said, 'This is agreeable.' He wrote the receipt and I wrote the check. . . . I assured him that, barring weather, that the building would be gone in thirty days. . . . I don't know why it wasn't put in the receipt. This conversation took place, and the man agreed. . . . Our agreement was between Erickson and I, after the telephone conversation he said that this would be acceptable—this would be agreeable, to give him a move date within ten days upon my assurance that this building would be moved within thirty days, barring weather, and that was agreed upon. No one could do it if the weather was bad. . . . He said something is going to have to be done about the time element on this, and I, at that time I told him, 'All right. I'll give you a definite move date within ten days, and I, —barring weather, the house will be gone in thirty days.' At that time he wrote the receipt and said that that was acceptable.''

and parol evidence is also admissible to show the terms of a receipt and even to vary the express terms of that receipt. (*Haidinger-Hayes, Inc.* v. *Marvin Hime & Co., supra,* pp. 51-52; 18 Cal.Jur.2d, Evidence, § 261, p. 746.)      Thus the deposit receipt, when reconciled with the oral testimony, was subject to the interpretation that Erickson received $250 for the described house which was to be moved off the property at a date to be specified within 10 days from the date of the receipt.

The trial judge was justified, therefore, in concluding that there was mutual assent as between plaintiff and Erickson as to all the essential terms of the agreement. These terms were found by the trial court to be as follows: that plaintiff agreed to buy and defendants agreed to sell the house in question for the sum of $250, provided it was moved within 30 days from November 14, 1962, weather permitting, the exact date of removal to be furnished defendants by plaintiff within 10 days from said date.

We now turn to the claim that Erickson was merely a "special agent" and that he had no authority to execute a contract of sale on behalf of defendants. The general rule as to the scope of an agent's authority is stated in Civil Code section 2319[6] as follows: "An agent has authority: 1. To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency: . . ." In the instant case it is conceded by both parties that we are dealing with the sale of personal property. Accordingly, the present case is not governed by the rule applicable to real property that, in the absence of evidence indicating otherwise, when the owner of realty lists it for sale with a broker or agent, the agent's authority extends only to finding a purchaser and not to entering into a contract of sale on behalf of the owner. (*Holway* v. *Malloy,* 70 Cal.App.2d 317, 319-320 [160 P.2d 893]; *Sackett* v. *Starr,* 95 Cal.App.2d 128, 133-134 [212 P.2d 535]; *Thompson* v. *Scholl,* 32 Cal.App. 4, 5 [161 P. 1006]; Rest., Agency 2d, § 53, comment b., pp. 157, 158.)

     With respect to personal property, it is the general rule that an agent may bind his principal if he does not exceed the power with which he is actually or ostensibly vested. (*Tynan Lbr. Co.* v. *W. A. Hammond Co.,* 124 Cal.App. 159, 163 [12 P.2d 45]; *Barrios & Co., Inc.* v. *J. R. Garrett Co.,*

---

[6]All statutory references hereinafter made are to the Civil Code unless otherwise indicated.

72 Cal.App. 786, 795 [238 P. 155]; *Ventura Mfg. etc. Co.* v. *Warfield,* 37 Cal.App. 147, 161 [174 P. 382]; *Wright* v. *Solomon,* 19 Cal. 64, 72 [79 Am.Dec. 196]; 3 Am.Jur.2d, Agency, § 99, p. 498.) Accordingly, in the light of this rule, whether a sale made by an agent is binding upon his principal must be determined with a view to the character and purpose of the agency. (3 Am.Jur.2d, *supra,* p. 499.) Therefore, consonant with section 2319, and the general rule, a selling agent is authorized to do whatever is necessary and usual to carry out the purpose of the agency, that is, the sale. (See § 2319 and 3 Am. Jur.2d, *supra,* § 101, p. 501.)

To assist in the determination of the extent of the agent's authority to sell, the Restatement sets forth certain rules as to the interpretation of such authority. (Rest.2d Agency, §§ 53-66, pp. 157-180.) Thus, an express authorization "to sell" property of the principal may be interpreted as meaning that the agent shall find a purchaser to whom the principal may sell, or make a contract of sale, or make a conveyance for the principal (§ 53). Authority "to find . . . a purchaser," unless otherwise agreed, means that the agent is restricted to the finding of such purchaser (§ 54). Such authority includes the authority to state the terms upon which the principal is willing to sell, to solicit offers in accordance therewith, and to describe the subject matter (§ 54). Where, however, the authority given is to "contract for a . . . sale" it includes the authority to enter into negotiations for and to complete the sale, including therein the usual or other appropriate terms, and, if a writing is required or is usual, to execute such writing (§ 55).

■ The record in the instant case discloses that when Stephens first contacted Erickson concerning the sale of the house he stated " 'Go ahead and sell it.' " When queried on cross-examination as to whether he had said to Erickson, during the telephone conversation hereinbefore alluded to, " 'You get a deal if you can improve on the time,' " Stephens replied "I may have. I'm not sure." In testifying with respect to this conversation Stephens stated: " [I]t ran along this line, that if he could sell the house and improve on the time, fine. What I was primarily interested in was getting the house off as soon as possible. And it ended at that point." In this respect it should be noted that Erickson testified he had stated to plaintiff, after learning of the Tost transaction, that he "thought we had a deal." Although the record also discloses that Erickson and Stephens both testified that any

offer concerning the sale of the house was subject to the latter's approval, this testimony merely created a conflict in the evidence.[7] Accordingly, in the light of the foregoing principles, and in view of the elementary principle that the evaluation and reconciling of any conflicts or inconsistencies is for the trial court and that the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence to support the findings, we are satisfied that there was substantial evidence in the record upon which the trial court could find that Erickson was authorized to sell the house in question and that this authorization included the authority to make a contract of sale.

Under the state of the record the evidence was such as to establish Erickson's authority both on the basis of actual and ostensible authority. "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." (§ 2316.) In the instant case the evidence was such as to warrant the finding that, during their telephone conversation, Stephens authorized Erickson to negotiate and conclude the sale of the house to a purchaser who would agree to remove the house within a time less than that contained in plaintiff's original offer. The record is equally susceptible of the inference that Erickson himself believed he had such authority.

The record also warrants the inference that by his conduct Stephens led plaintiff to believe he had conferred authority upon Erickson to sell the house. Based on the fact that Erickson accepted plaintiff's counterproposal to remove the house within 30 days and gave him the receipt in question following the telephone conversation between Erickson and Stephens which was carried on in plaintiff's presence, it is reasonable to infer plaintiff assumed that as a result of the telephone conversation Erickson was authorized to sell the house upon the terms and conditions agreed upon between himself and Erickson. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (§ 2317.) Within the ambit of this definition it has been held that if a principal by his acts has led others to believe that he

---

[7]Erickson testified that when "its stated that an agent is authorized to sell a house" such expression means, in the trade, that "he's authorized to take an offer and a deposit." Stephens also testified that he would not have accepted the terms contained in the receipt given by Erickson to plaintiff.

has conferred authority upon an agent, he cannot be heard to assert, as against third persons who have relied thereon in good faith, that he did not intend to confer such power. (*Safeway Stores, Inc.* v. *King Lumber Co.*, 45 Cal.App.2d 17, 22 [113 P.2d 483]; *Gaine* v. *Austin*, 58 Cal.App.2d 250, 260 [136 P.2d 584].)

It is defendants' contention that it was incumbent upon plaintiff to inquire into the extent of Erickson's authority. Where the agent acts within the scope of his actual authority, it is immaterial whether or not an inquiry into the extent of the authority has been made by a person dealing with the agent. (*Wood* v. *Crocker First Nat. Bank*, 107 Cal. App. 685, 686 [291 P. 221]; *Palo Alto Mutual etc. Assn.* v. *First Nat. Bank*, 33 Cal.App. 214, 223 [164 P. 1124]; *Rankin* v. *Brown*, 131 Cal.App. 137, 143 [20 P.2d 954].) With regard to ostensible authority, the rule is that, if the principal clothes his agent with such authority, a person dealing with the agent, in the absence of any conduct on the part of either principal or agent warranting inquiry, is entitled to rely upon that apparent authority and is not bound by undisclosed limitations. (2 Cal.Jur.2d, Agency, § 44, p. 689; § 2318.) The rule asserted by defendants that a person who does not determine the extent of the agent's power acts at his own peril (*Keele* v. *Clouser*, 92 Cal.App. 526, 532 [268 P. 682]; *Hill* v. *Citizens Nat. Trust & Sav. Bank*, 9 Cal.2d 172, 177 [69 P.2d 853]), does not apply where, by reason of the conduct of the principal, there is no ground for inquiry. (*Fairbanks* v. *Crump Irr. etc. Co., Inc.*, 108 Cal.App. 197, 209 [291 P. 629]; *Robinson* v. *American Fish etc. Co.*, 17 Cal.App. 212, 219-220 [119 P. 388].) The rule contended for by defendants applies to an assumed agency. Persons dealing with an assumed agent, whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it. (*Hill* v. *Citizens Nat. Trust & Sav. Bank*, supra, p. 177; *Ernst* v. *Searle*, 218 Cal. 233, 240 [22 P.2d 715].) In the present case there was no controversy with respect to the existence of the agency, the controverted issue being the nature and extent of the authority. Assuming *arguendo* that the instant case is not one in which plaintiff was entitled to rely upon Erickson's apparent authority by reason of Stephens' conduct, the burden was upon plaintiff to establish the nature and extent of Erickson's authority. As hereinbefore indicated the

evidence adduced by plaintiff was sufficient to meet this burden.

## Damages

Defendants assert that the judgment awarded special damages which were not properly pleaded, and that the award was based upon loss of profits which were speculative and uncertain.[8] Before proceeding to a discussion of these assignments of claimed error, we should point out that the applicable measure of damages for the conversion of personal property is section 3336 which reads as follows: "The detriment caused by the wrongful conversion of personal property is presumed to be: First—The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and Second— A fair compensation for the time and money properly expended in pursuit of the property."

Although the first part of section 3336 appears to provide for alternative measures of recovery, the first of the two measures, namely the value of the property converted at the time and place of conversion with interest from that time, is generally considered to be the appropriate measure of damages in a conversion action. (48 Cal.Jur.2d, Trover and Conversion, § 44, p. 589; 2 Witkin, Summary of Cal. Law (1960) § 430, p. 1627; *Lonergan* v. *Monroe*, 77 Cal.App.2d 223, 225 [175 P.2d 42]; *Fletcher Aviation Corp.* v. *Landis Mfg. Co.*, 95 Cal.App.2d 905, 909-910 [214 P.2d 400]; *Murphy* v. *Wilson*, 153 Cal.App.2d 132, 136 [314 P.2d 507].) The determination of damages under the alternative provision is resorted to only where the determination on the basis of value at the time of conversion would be manifestly unjust. (48 Cal.Jur.2d, Trover and Conversion, *supra*, pp. 589-590; *Betzer* v. *Olney*, 14 Cal.App.2d 53, 61 [57 P.2d 1376]; see *Ruiz* v. *Bank of America*, 135 Cal.App.2d Supp. 860, 864 [287 P.2d 409]; *Wade* v. *Markwell & Co.*, 118 Cal.App.2d 410, 432 [258 P.2d 497].)

In the instant case the evidence and the admissions made by the parties[9] clearly establish the value of the house

---

[8]Defendants contend that if they are liable the proper measure of damages is the sum of $250, the value of the house.

[9]In his complaint plaintiff alleged that the sum of $250 which he paid for the house "was the fair and reasonable value of said property." This allegation was not denied by defendants in their answer, and hence

to be $250. Accordingly, under the first alternative of section 3336 the trial court would have been obliged to award damages in the sum of $250, plus interest from the time of the conversion. However, since the trial court awarded damages in the sum of $3,040, it is apparent that it did so upon the basis of the second alternative of section 3336, namely, "an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of . . . ." Our immediate inquiry, therefore, is whether, under the circumstances of the instant case, damages were properly assessable under the second alternative, and, if so, whether such measure of damages was properly applied.

We are satisfied that there were special circumstances in the present case which required a different measure of damages to be applied than that provided under the first alternative. The record discloses that plaintiff was engaged in the business of buying houses for the purpose of moving them to other lots, rehabilitating them, and then selling them. The record further discloses that, based upon cost factors derived from previous experience, the cost of moving the subject house to a certain available lot, and then renovating it, would amount to approximately $8,000. Plaintiff testified that he had "several choices of sites" upon which to move the house, that he "had a verbal agreement" to purchase the lot, upon which he proposed to move the house, from one Camerlo, who owned two lots at the site, for $4,000. Plaintiff also testified that, based upon such experience and other sales made by him in the general area where the house was to be relocated, the probable selling price of the house and lot would be the sum of $17,000. Based upon this selling price, plaintiff stated that his anticipated profit would be the difference between such price and the aggregate total cost of $12,000 incurred for the house moving and renovating and for the lot acquisition.

A real estate broker-salesman named Woods, called as a witness by plaintiff, testified that he was familiar with this house and its proposed removal, and that "Based on the projected renovation process" he was of the opinion that it would sell from between $16,950 to $17,250. Woods also stated that he had sold other houses for plaintiff, and that he intended to sell this house in which case his commission would

must be deemed to have been admitted. Moreover, defendants concede in their brief that the value of the house on the day of the alleged conversion was the sum of $250.

118

be 6 per cent. He also testified that houses were selling in the area in question in a price range of from $15,950 or $16,000 to $18,500.

The "amount of compensation . . . must be left to the sound discretion of the trial court, to be ascertained and adjudged after consideration of all the facts and circumstances established by the evidence in the case." (*LeBrun* v. *Richards,* 210 Cal. 308, 320 [291 P. 825]; *Wade* v. *Markwell & Co., supra,* p. 432.) In the case at bench, although the trial court did not indicate in its findings or memorandum of decision how it arrived at damages in the sum of $3,040, the award is not unreasonable, provided the trial court was properly justified in awarding damages for loss of anticipated profits, since damages in such amount find support in the record. Anticipated profits in the sum of $3,040 may be established within the range of the selling prices and aggregate costs testified to. Thus a resale value of $16,000, less the sum of a commission of 6 per cent (amounting to $960), a lot cost of $4,000, and moving and renovation costs preparatory to resale in the amount of $8,000, leaves a net profit of $3,040.

It is well established in this state that recovery may be had in a tort action for loss of profits resulting from the tort if such profits can be shown with a reasonable degree of certainty; but recovery is denied where the profits are uncertain, speculative or remote. (*Johnson* v. *Central Aviation Corp.,* 103 Cal.App.2d 102, 105-106 [229 P.2d 114]; *Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193, 199 [143 P.2d 12]; *Razzano* v. *Kent,* 78 Cal.App.2d 254, 261-262 [177 P.2d 612]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists,* 227 Cal.App.2d 675, 702-703 [39 Cal.Rptr. 64].) Although evidence to establish profits must not be uncertain or speculative, "This rule does not apply to uncertainty as to the amount of the profits which would have been derived, but to uncertainty or speculation as to whether the loss of profits was the result of the wrong and whether any such profits would have been derived at all." (*Continental Car-Na-Var Corp.* v. *Moseley,* 24 Cal.2d 104, 113 [148 P.2d 9].)

It is clear from the cases dealing with prospective profits that the principle inherent in the recovery of such profits is that the evidence must make reasonably certain their nature, occurrence, and extent. (See *Grupe* v. *Glick,* 26 Cal.2d 680, 692-693 [160 P.2d 832].) Moreover, where such profits are allowable, a defendant cannot complain if the

probable profits are, of necessity, estimated, since it was the defendant himself who prevented the plaintiff from realizing the profits. (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists, supra,* p. 703; see *Natural Soda Products Co.* v. *City of Los Angeles, supra,* p. 200.)

Turning to the present case in the light of these principles, we are satisfied that plaintiff has established a satisfactory basis for estimating what his anticipated profits would have been had there been no tort. There was evidence of operating experience sufficient to permit a reasonable estimate of the probable expense required to place the house in a condition where it would be ready for resale so as to furnish a basis for estimating what the probable profits would have been when sold at the market values prevailing in the area. We find no merit, moreover, in defendants' contention that the anticipated profits were conjectural on the basis that plaintiff had not purchased the lot in question, and that therefore it was speculative as to whether he could have acquired it. The record discloses that plaintiff stated he had a verbal agreement to purchase the lot for $4,000. We are not called upon to determine the validity of the agreement between plaintiff and the lot owner, but it suffices for the purpose of our review to state that such evidence was susceptible of the inference that plaintiff was in a position to acquire ownership of the lot so as to move the house onto it. The performance of work and the expenditure of money upon the house in question by plaintiff, immediately upon signing the receipt, so as to make it ready for removal is some evidence that plaintiff possessed a lot upon which to place it. Moreover, there was evidence in the record that other lots in the area were available to plaintiff for approximately the same cost as the one in question.

Defendants contend that the anticipated loss of profits is not "the natural, reasonable and proximate result of the wrongful act complained of," within the meaning of section 3336. Although no California case which has applied the alternative measure of damages in a conversion case has specifically defined this language, we are satisfied that its meaning is synonymous with the term "proximate cause" or "legal cause." These terms mean, in essence, "that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." (Prosser, Torts (3d ed. 1964) p. 240.) In determining whether this connection exists, the question is whether it was reason-

ably foreseeable to a prudent person, having regard for the accompanying circumstances, that injury or damage would likely result from his wrongful act. (*Osborn* v. *City of Whittier*, 103 Cal.App.2d 609, 615-616 [230 P.2d 132]; *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 216 [157 P.2d 372]; *Werkman* v. *Howard Zink Corp.*, 97 Cal.App.2d 418, 425 [218 P.2d 43].) This question being one of fact to be determined generally by the trier of fact (*Osborn* v. *City of Whittier, supra*, p. 616; *Barker* v. *City of Los Angeles*, 57 Cal. App.2d 742, 748 [135 P.2d 573]; *Bauman* v. *City & County of San Francisco*, 42 Cal.App.2d 144, 154 [108 P.2d 989]), we are satisfied that the trial court's implied finding in the instant case that plaintiff's loss of profits from the contemplated sale of the house was proximately caused by defendants' wrongful conversion is adequately supported by the evidence. We reach this conclusion based on the facts, as established by the record, that plaintiff was engaged in the business of buying houses for the purpose of moving them to other lots and reselling them, and that defendants desired to have the subject house moved off their property. Therefore, the conclusion is inescapable that it would be foreseeable to reasonably prudent persons in defendants' position that if they wrongfully prevented plaintiff from carrying out his plans with regard to the house, plaintiff's damages would include a loss of profits from the contemplated sale.

Defendants assert, further, that since loss of profits constitutes special damages, and since plaintiff pleaded damages generally, he is not entitled to recover such loss of profits.

It is the rule that special damage must be set forth in the complaint or the plaintiff will not be permitted to give evidence of it at the trial. (*Colvig* v. *RKO General, Inc.*, 232 Cal.App.2d 56, 69 [42 Cal.Rptr. 473]; *Shook* v. *Pearson*, 99 Cal.App.2d 348, 351-352 [221 P.2d 757].) "General damages," however, need not be specially pleaded. (*Armstrong* v. *Adams*, 102 Cal.App. 677, 682 [283 P. 871]; *Castino* v. *Ritzman*, 156 Cal. 587, 588 [105 P. 739]; *Mitchell* v. *City of Santa Barbara*, 48 Cal.App.2d 568, 573 [120 P.2d 131].)

General damages are "those which necessarily result from the act complained of," (*Morris* v. *Allen*, 17 Cal.App. 684, 688 [121 P. 690]) and are implied by law to have thereby accrued to plaintiff. (*Stevenson* v. *Smith*, 28 Cal. 102, 104 [87 Am. Dec. 107]; *Mitchell* v. *Clarke*, 71 Cal. 163, 167 [11 P. 882, 60 Am. Rep. 529]; *Armstrong* v. *Adams, supra*, p. 682.) Special damages, on the other hand, are defined as damages

which do not arise from the wrongful act itself, but depend on the circumstances peculiar to the infliction of each respective injury. (*Berry* v. *Bank of Bakersfield*, 177 Cal. 206, 210 [170 P. 415]; *Drinkhouse* v. *Van Ness*, 202 Cal. 359, 377 [200 P. 809].)

With respect to loss of profits, the appellate courts have made a distinction between actions ex contractu and ex delicto insofar as the pleading of such loss is concerned. In cases involving breach of contract it has been held that loss of profits need not be specially pleaded. (*Morello* v. *Growers Grape Products Assn.*, 82 Cal.App.2d 365, 375 [186 P.2d 463]; *Brunvold* v. *Johnson*, 36 Cal.App.2d 226, 230 [97 P.2d 489]; *Tahoe Ice Co.* v. *Union Ice Co.*, 109 Cal. 242, 249 [41 P. 1020]; *Grupe* v. *Glick, supra,* 26 Cal.2d 680, 688.) The rationale of the cases holding that lost profits are recoverable without special allegations is that they are usually the direct and natural result of a breach of contract and are such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract. (See *Tahoe Ice Co.* v. *Union Ice Co., supra,* p. 249; and *Grupe* v. *Glick, supra,* p. 688.) In tort cases, however, it has been held that damages from loss of profits are special in their nature and that therefore the facts must be particularly alleged in order to admit evidence thereof and justify recovery. (*Shaw* v. *Southern Pacific R.R. Co.*, 157 Cal. 240, 242 [107 P. 108]; *Lombardi* v. *California St. Ry. Co.*, 124 Cal. 311, 319-320 [57 P. 66]; *McCarthy Co.* v. *Boothe*, 2 Cal.App. 170, 173 [83 P. 175]; *Maus* v. *Scavenger Protective Assn.*, 2 Cal.App.2d 624, 631 [39 P.2d 209].) The distinction in the application of the rule in tort cases appears to lie in the rationale that loss of profits is not generally the direct and natural result of the tort. (See *Lombardi* v. *California St. Ry. Co., supra,* pp. 319-320.)

In the present case the original complaint was one for specific performance in which no damages were pleaded in the complaint.[10] The only reference to damages was contained in the prayer which, in addition to seeking a conveyance of the house, also prayed for damages in the sum of $6,000 "for withholding conveyance of said house; . . ." No demurrer was interposed and the cause proceeded to trial on

---

[10]The gist of the complaint was that a contract had been completed, a fair consideration mutually tendered and accepted, and a present sale consummated by defendant Erickson, as agent of Ferrol Development Company. Plaintiff prayed that defendants execute a good and sufficient conveyance of the property.

the issues tendered by the answer.[11] At the trial, during the examination of plaintiff, his counsel sought to introduce evidence of loss of profits, to which offer defendants objected on the ground of irrelevancy. Plaintiff's counsel thereupon moved to amend his complaint to incorporate in the body of the complaint the allegations in the prayer with respect to damages.[12] This motion was granted. Counsel for defendants thereupon indicated that defendants were not prepared to meet this claim of ''specific damages,'' and the trial court indicated that if a continuance was necessary the same would be granted. Plaintiff then adduced evidence with respect to his claim of loss of profits. Although defendants interposed objections on the ground that a proper foundation had not been laid, and on the basis of relevancy and hearsay, no objection was thereafter interposed that such damages for loss of profits were not within the purview of the allegations of the complaint. Moreover, plaintiff was cross-examined with respect to his testimony as to loss of profits. At the conclusion of the first day of trial, on March 21, 1963, the trial having proceeded into defendants' case, the trial was adjourned until August 1, 1963. When the trial resumed, defendants presented evidence on the issue of loss of profits. Before doing so, counsel for defendants noted that he was presenting such evidence because the court had deemed such evidence admissible, and stated ''we object to the admissibility of it,'' to which the court replied: ''I understand.'' At the conclusion of defendants' case and rebuttal by plaintiff, the cause was ordered submitted on briefs.

On September 24, 1963, the trial judge filed his memorandum of decision indicating he found that defendants wrongfully converted the house in question to plaintiff's damage in the sum of $3,040. Thereafter, and on November 18, 1963, plaintiff filed an ''Amended Complaint to Conform to Proof'' alleging in essence that defendants had, on November 14, 1962, sold to plaintiff the house in question and had thereafter converted it to their own use ''to plaintiff's damage in the sum of Three thousand, Forty Dollars ($3,040.00).'' On the same

---

[11]The answer alleged, in essence, that no binding contract had been entered into between plaintiff and defendants.

[12]Plaintiff's counsel stated as follows: ''If Your Honor please, I'd like to bring this in, or I'd like to ask to amend the complaint to show damages, loss of anticipated profits. You will note the prayer does show a—an item of $6,000 damages. Counsel is right. There is no item in the body of the complaint. I was going to put this on—I intended to ask to amend to conform to proof. I'd like to at this time to ask to amend the complaint to put it in as it is in the prayer and not in the body of the complaint.''

day, the trial court made and signed its "Findings of Fact and Conclusions of Law" and judgment.

It clearly appears that the original complaint sounded in contract. In the light of the authorities heretofore cited, plaintiff would have been entitled to prove loss of profits under the general allegation of damages. Although the reporter's transcript seems to indicate that plaintiff moved to amend the complaint for the purpose of alleging the general damages which were omitted from the body of his complaint, and that *this* motion was granted, the minutes of the court, as contained in the clerk's transcript, disclose that the motion which plaintiff made, and which was granted by the court, was a motion to amend the complaint "to conform to proof." The record is barren as to the basis upon which the amendment to conform to proof was granted. However, in view of the fact that the trial court in its memorandum of decision and in its findings indicated that its decision was based on the theory of conversion, and since no error is claimed in this respect by defendants, we must assume that the amendment to conform to proof was for the purpose of amending the original complaint for specific performance to one in tort for conversion. It should also be pointed out here that both parties, in their briefs on appeal, have treated the present case as one in conversion, and, therefore, under well-established principles the appellate court must consider that the case was tried on this theory.

We thus have a situation where, during the course of the trial, plaintiff changed his theory of recovery from specific performance to conversion, that is, from an ex contractu action to one ex delicto. No claim is made by defendants that the trial court erred or abused its discretion in allowing the amendment to conform to proof or the change in plaintiff's theory of recovery. The only claim of error is that the amended complaint did not plead the loss of profits specially.

As a result of the amendment to conform to proof the action became one in tort and therefore any allegations of damages purporting to seek loss of anticipated profits should have been pleaded specially. The amended complaint, however, merely contained a general allegation of damages. Our inquiry, therefore, is whether under the state of the record it can be said that defendants were prejudiced. Initially it should be noted that no objection was interposed to the amended complaint. Moreover, the purpose of the rule requiring that special damages be specifically pleaded is to inform the defendant of the

case he must meet and thus to prevent surprise. (*Mills* v. *San Diego Conservatory of Music,* 47 Cal.App. 300, 306 [191 P. 546].) In the case at bench, while defendants may have been taken by surprise when plaintiff originally offered evidence relating to loss of profits, they were given ample opportunity to meet this evidence and to prepare for this issue when they were granted a continuance in excess of four months. Defendants did offer evidence on this issue. Therefore, they were not misled by the amended complaint nor were they prejudiced by the general allegation of damages in this complaint since defendants tried their case with reference to the issue of loss of profits.

In *First Nat. Bank* v. *De Moulin,* 56 Cal.App. 313 [205 P. 92], the plaintiff was given permission at the conclusion of the trial to amend its complaint by interlineation to conform to proof as to the number of shares owned by the defendant, but failed to do so. The reviewing court, in refusing to reverse the judgment because of such failure, stated: ''But, leave having been given to amend and the court having found the fact in accordance with the evidence and in conformity with the amendment that would have been made had plaintiff availed itself of the permission granted, we think that we should consider the case as though the amendment had in fact been made.'' (Pp. 323-324.) (To the same affect see: *Armstrong* v. *Lassen Lumber & Box Co.,* 204 Cal. 529, 531-532 [209 P. 453]; *Stark* v. *Wellman,* 96 Cal. 400, 402-403 [31 P. 259].) In *Stark,* we find this statement with respect to an amendment made after verdict and the entry of judgment: ''But if its effect had been to help the complaint, the defendant still was not injured, for he tried his case with reference to it, and was not prejudiced by the fact that it was not reduced to writing until afterwards.'' (P. 403.)

The judgment is affirmed.

Sullivan, P. J., and Sims, J., concurred.