[Civ. No. 66797. Second Dist., Div. Two. July 21, 1983.]

ROBERT W. KRUEGER et al.,
Plaintiffs, Cross-defendants and Appellants, v.
BANK OF AMERICA, Defendant, Cross-complainant and Appellant;
SECURITY PACIFIC NATIONAL BANK,
Defendant, Cross-complainant and Respondent.

COUNSEL

Hughes, Hubbard & Reed, William T. Bisset, D. Christopher Wells, Jr., Lois C. Moonitz and John R. Hetland for Plaintiffs, Cross-defendants and Appellants.

Ullar Vitsut and Charles A. Druten for Defendant, Cross-complainant and Appellant.

Sheppard, Mullin, Richter & Hampton, William M. Burke, Vincent K. Schubert and Roger Bernhardt for Defendant, Cross-complainant and Respondent.

OPINION

**COMPTON, Acting P. J.**—Plaintiffs Robert and Marjorie Krueger (Kruegers) brought this action seeking a judicial determination of their rights and liabilities under certain continuing guarantees executed and delivered to defendants Bank of America National Trust and Savings Association (Bank of America) and Security Pacific National Bank (Security Pacific) (sometimes collectively referred to as the Banks). In separate causes of action alleging, inter alia, conversion, breach of contract and breach of fiduciary duty, the Kruegers further sought the return in full of their pledged collateral, constituting approximately 290,000 shares of common stock, held by both financial institutions. The Banks cross-complained for the remaining amounts owing under the guarantees.

Following a trial without jury, judgment was entered exonerating the Kruegers from further liability on the guarantees and awarding them $137,000 in costs and fees. Except for a partial return of the pledged assets, all other relief was denied. The Banks took nothing by their cross-complaints.

The Kruegers appeal from that portion of the judgment denying them complete recovery of the pledged stock. Bank of America cross-appeals solely from the order awarding fees and costs.

Before proceeding to a discussion of the facts, we note here that the appeal before us is based upon only the clerk's transcript and, as such, is considered to be upon the judgment roll alone. *Kopf* v. *Milam* (1963) 60 Cal.2d 600, 601 [35 Cal.Rptr. 614, 387 P.2d 390]; *Estate of Larson* (1949) 92 Cal.App.2d 267, 269 [206 P.2d 852].) ■ The trial court's findings of fact and conclusions of law therefore are presumed to be supported by substantial evidence and are binding upon us, unless the judgment is not supported by the findings or reversible error appears on the face of the record. (*Aruba Bonaire Curacao Trust Co.* v. *United California Bank* (1973) 32 Cal.App.3d 281, 283 [107 Cal.Rptr. 924]; *Bristow* v. *Morelli* (1969) 270 Cal.App.2d 894, 896, 898 [27 Cal.Rptr. 796]; *White* v. *Jones* (1955) 136 Cal.App.2d 567, 569 [288 P.2d 913].) Accordingly, our summary of the facts is taken from these findings and conclusions.

During the late 1960's, as part of an investment scheme, Robert Krueger became a director and major stockholder of General Resource Development (GRD), a corporation devoted to the development of real property in San Luis Obispo County. Beginning in 1970, GRD sought financing for its "Oak Shores" project from Security Pacific and, in slightly less than one year,

had obtained loans in excess of $1.8 million. To induce the making of these loans, the Kruegers executed a "General Continuing Guarantee,"[1] dated April 25, 1970, in which they guaranteed the payment of all of GRD's indebtedness to Security Pacific not to exceed the principal sum of $2.2 million. As security for this guaranty, the Kruegers pledged 196,500 shares of common stock of Planning Research Corporation (PRC).

In 1971, a similar agreement was reached with Bank of America for loans eventually totalling over $2 million. As a guarantee, the Kruegers again pledged another 100,000 shares of PRC stock. In May 1972, upon Bank of America's demand and as security for GRD's obligations, GRD delivered to the Bank a deed of trust covering approximately 300 parcels of real property in the Oak Shores development. The following month, GRD granted Bank of America a security interest in all of its assets then in the bank's possession.

By mid 1972, the project had faltered and GRD's financial difficulties were manifest. Following extensive negotiations, the parties agreed to restructure the various loans in an attempt to stabilize a rapidly deteriorating situation. In September 1972, the Banks, GRD, the Kruegers, Argonaut Insurance Company, which had issued performance and payment bonds for the Oak Shores project, and several other investors entered into a 24-page "Loan Agreement" (the September 1972 agreement), under the terms of which the Banks and Argonaut[2] advanced GRD an additional $900,000.

GRD's obligation to repay both the old and new loans was secured by the deed of trust previously delivered to Bank of America, a second deed of trust covering the same lots, and a separate deed of trust on property owned by GRD adjacent to the Oak Shores development. The Banks were also granted a security interest in machinery and equipment and in certain options to purchase real property owned by GRD. The agreement further provided that after February 8, 1974, all loans would be payable upon demand. Bank of America was designated as the representative of all creditors.

As part of the September 1972 agreement, the Kruegers reaffirmed their guarantees to both Banks. In a separately executed letter, dated September 7, 1972, the parties agreed that Security Pacific and Bank of America would give the Kruegers written notice prior to the sale of any of the pledged PRC stock. Such notice was for the purpose of providing the Kruegers with an opportunity to arrange, if desired, their own sale of the stock.

---

[1] Pursuant to rule 10(b), California Rules of Court, we have ordered all relevant documents introduced and admitted into evidence at trial transmitted to this court.

[2] Argonaut has never been joined as a party to the within action.

Subsequent to the signing of the September 1972 agreement, the obligations of GRD to the Banks were modified to provide a one month deferral of interest payments and the use of lot sale proceeds to purchase additional real property rather than pay the Banks. Although the Kruegers did not contemporaneously consent to these changes in GRD's obligations, the modifications fell within the terms of the guarantees and loan agreements. In 1972 and 1973, however, GRD sold $85,000 worth of its equipment with the Banks' consent and authorization but without official notice to the Kruegers.

By 1974, GRD's financial condition had worsened causing it to default on its loans. On March 11, 1975, both Banks made demand upon GRD for repayment of its debts. In a series of transactions between May 30, 1975 and June 2, 1975, Bank of America sold the 100,000 shares of PRC stock pledged to it by the Kruegers, and between June 4, 1975, and June 12, 1975, Security Pacific sold all but 15,500 of its 196,500 shares. These sales, conducted over the New York Stock Exchange, were accomplished without notice to the Kruegers in breach of the 1972 agreement.[3] The proceeds from each sale, totalling almost $1.3 million, were eventually credited against GRD's outstanding loans.

In late January 1976, the Banks notified the Kruegers by written letter that a nonjudicial foreclosure on the real property would be conducted on March 4, 1976, and that if they failed to take action to protect their interests prior to the sale, they could lose their right to seek reimbursement from GRD for the loss resulting from the sale of the PRC stock. Although in the same notice both Banks tendered their loans to the Kruegers for purchase, they knew that the Kruegers were without sufficient funds to undertake such a transaction.

On February 28, 1976, the Kruegers, after seeking legal advice, objected to the planned sale and warned that they were prepared "to take appropriate steps to recover damages from . . . [the Banks] to the extent . . . [their] past and future actions jeopardize our rights in any manner." Nonetheless the foreclosure occurred as scheduled pursuant to the power of sale provisions contained in each deed of trust encumbering GRD's property. Although the sale was credited against GRD's obligations, there remained a balance of approximately $3.5 million due on the loans.

Based upon the evidence before it, the trial court found two independent grounds for exonerating the Kruegers from further liability on their guar-

---

[3]Security Pacific first notified the Kruegers on June 23, 1975, that it had completed the sale of 181,000 shares of stock.

antees and for returning to them the 15,500 shares retained by Security Pacific.[4] The court first determined that the banks' failure to give the Kruegers advance notice of the sale of the pledged collateral constituted a breach of the September 1972 agreement and precluded any further recovery on the guarantees. The court further held that the Banks were estopped from asserting a deficiency claim because of their election to conduct a nonjudicial foreclosure sale of GRD's property thereby destroying the Kruegers' statutory rights (see Civ. Code, §§ 2847-2848) to subrogation and reimbursement.

On appeal the Kruegers contend that the Banks must reimburse them for all 296,500 pledged shares converted and that pursuant to Civil Code section 3336 such shares must be valued at their highest fair market value between the date of conversion and the date of judgment.[5]

■ The Kruegers' argument that the Banks are "estopped" from retaining the proceeds of the sale of the PRC stock is based on the reasoning of the court in *Union Bank* v. *Gradsky* (1968) 265 Cal.App.2d 40 [71 Cal.Rptr. 64]. In that case, plaintiff bank made a construction loan to a property owner which was secured by a first trust deed on the property. As additional security for the loan, defendant general contractor guaranteed the property owner's note. When the note went unpaid, the bank caused the security to be sold at a trustee's sale, and bid in the property. The bank then brought suit against the defendant on his guaranty to recover the amount remaining unpaid on the loan. The trial court sustained a demurrer to the complaint without leave to amend and entered a judgment of dismissal.

Affirming the judgment, the Court of Appeal concluded that the bank was estopped from seeking a deficiency judgment against the guarantor because the bank had elected to pursue the remedy of a nonjudicial sale of the security and had thereby destroyed the guarantor's right to obtain reimbursement from the principal debtor.

The rationale of estoppel articulated in *Gradsky* is premised on Code of Civil Procedure section 580d.[6] Under that section, the principal debtor is

---

[4]Pursuant to Civil Code section 3336, the trial court awarded the Kruegers the fair market value of the stock at the time of conversion (June 12, 1975), plus interest ($104,875.87).

[5]Although Bank of America originally appealed from that portion of the judgment exonerating the Kruegers from any further liability on their guarantees and awarding them the fair market value of the 15,500 shares of pledged collateral at the time of conversion, that claim has been abandoned in the briefs.

[6]Code of Civil Procedure section 580d provides in pertinent part: "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property hereafter executed in any case in which the real property has been sold by the mortgagee or trustee under power of sale contained in such mortgage or deed of trust."

immunized from any deficiency judgment whenever the creditor conducts a nonjudicial foreclosure of the encumbered property. If the creditor, however, could still recover a deficiency judgment from the guarantor after such a sale, the guarantor would be denied his right of subrogation against the debtor solely by virtue of the kind of sale the creditor elected to conduct. The *Gradsky* court therefore determined that the ultimate impact of the election should fall on the creditor since he is the one who not only makes the election, but owes as well a basic duty to the guarantor not to impair the latter's remedies against the principal debtor.[7] The court reasoned that by choosing to pursue a remedy which destroys both the security and the possibility of the guarantor's reimbursement from the principal debtor, the creditor should be estopped from pursuing the guarantor for a deficiency following a nonjudicial sale of the property. The creditor's recovery therefore is not directly barred by section 580d, but because the statute prevents a deficiency judgment by the guarantor against the debtor. (*Id.*, at pp. 46-47.)

In the case under review the trial court adopted the reasoning of the *Gradsky* court and determined that the Banks' election to proceed by nonjudicial foreclosure and sale of GRD's real property precluded "any further payment on the deficiency on GRD's debt from the Kruegers on their guarantees of GRD's obligations." The court therefore concluded that since the 15,500 shares of PRC stock held by Security Pacific constituted security for a debt extinguished by the Banks' election of remedies, the Kruegers were entitled to its recovery.

The Kruegers argue, however, that the trial court's application of *Gradsky* was far too limited and urge this court to fashion a new rule of law that would allow a guarantor to recover damages (i.e., recoup its losses) whenever a creditor first proceeds against the guaranty and thereafter elects to conduct a nonjudicial foreclosure of the secured real property. We believe that any such extension of the *Gradsky* rationale is unwarranted and, if adopted, would render the obligations undertaken by a guarantor less than worthless.

Nothing in the *Gradsky* opinion suggests or implies that the principle of estoppel, discussed therein and used defensively by the guarantor to avoid liability, may be employed offensively to hold a creditor liable in damages for actions lawfully and properly taken *prior* to a nonjudicial foreclosure

---

[7]Ordinarily, a creditor has three options on the default of the principal debtor: (1) He can bring an action for judicial foreclosure; (2) he can sue the guarantor on the guaranty agreement without proceeding against the principal (assuming a waiver of Civ. Code, § 2845); or he can proceed with a nonjudicial sale. (*Union Bank* v. *Gradsky, supra,* 265 Cal.App.2d at p. 43.)

sale. We believe this observation comports with both the language and spirit of *Gradsky* itself.

In detailing the various remedies available to a creditor upon default of the principal obligor, the *Gradsky* court emphasized that section 580d only prohibits a deficiency judgment where the action is on "a note." "An action by the Bank against . . . [the guarantor] before any resort to the security is neither an action on 'a note' nor is it an action to recover a 'deficiency.' The action is on the guarantee, not on the note, and in the absence of either judicial or nonjudicial foreclosure of the security, there exists no 'deficiency.' Section 580d cannot be stretched to shield . . . [the guarantor] from liability to the Bank on his guarantee before resort to the security." (*Id.*, at p. 44.)

Consistent with these fundamental principles is the decision in *Aruba Bonaire Curacao Trust Co.* v. *United California Bank* (1973) 32 Cal.App.3d 281 [107 Cal.Rptr. 924]. In that case, plaintiff's assignor, McMillan, guaranteed a loan made by defendant bank to Erwan Country Club. McMillan thereafter pledged 60,000 shares of stock to secure both his personal obligations to the bank and his obligations as a guarantor of the Erwan loan. Pursuant to the plaintiff's request all but 7,350 shares of the stock were sold to pay off McMillan's personal obligations to the bank. The remainder of the cash proceeds from this sale were then used to purchase a $25,000 cashier's check that was pledged to the bank as substitute collateral for the guarantee. The bank later cashed the check and applied it in partial payment of McMillan's guaranty of the Erwan loan. The bank subsequently foreclosed on the real property securing the loan by exercising the trustee's power of sale in the deed of trust.

In rejecting the plaintiff's attempt to recover the check proceeds, the *Aruba* court found that ". . . the $25,000 realized by UCB some two years prior to the nonjudicial sale and for which plaintiff presently seeks reimbursement, does not (and could not) represent any deficiency following such sale." (*Id.*, at p. 286.) Citing to *Gradsky* in support of this conclusion, the court stated: "[I]f UCB had instituted an action on the guarantee (instead of proceeding as it did), it could not have been properly contended that section 580d barred any claim thus asserted; by the same process of reasoning, UCB cannot now be estopped from realizing on the money which it applied in the manner here indicated." (*Id.*, at p. 286.)

We find the Kruegers' attempt to distinguish *Aruba* unpersuasive. Although we recognize that there are factual differences between *Aruba* and

the case at bench,[8] it is clear that the actions of the banks in both instances are essentially similar and that the loss suffered by the Kruegers is virtually identical to that sustained by McMillian. The inapplicability of the estoppel theory articulated in *Gradsky* to the facts of either *Aruba* or the instant case is manifest.

In any transaction the guarantor may, of course, insist that the security be exhausted first when the creditor seeks relief against him. (Civ. Code, § 2845; *Moffett* v. *Miller* (1953) 119 Cal.App.2d 712 [260 Cal.Rptr. 215]; *United California Bank* v. *Maltzman* (1974) 44 Cal.App.3d 41 [118 Cal.Rptr. 299].) This right, however, may be expressly waived, as it was in the case at bench. (*Engelman* v. *Bookasta* (1968) 264 Cal.App.2d 915 [71 Cal.Rptr. 120]; *American Guaranty Corp.* v. *Stoody* (1964) 230 Cal.App.2d 390 [41 Cal.Rptr. 69].) When such a waiver has occurred, and the creditor proceeds against the guarantor first, the action is one to compel payment on the debt according to the guaranty, and does not involve the real property security. Where the creditor *thereafter* elects to sell the secured property by way of a nonjudicial foreclosure, the protection afforded the debtor under the antideficiency laws is simply not available to the guarantor. Likewise, such protection is not available under the theory of estoppel.

Were the rule otherwise, a nonjudicial foreclosure of a deed of trust would bar any subsequent recourse to the collateral securing the guaranty and would require a refund to the guarantor of the proceeds of any prior sale of such collateral. We cannot sanction such an inequitable result. Under the circumstances presented here the parties, namely the debtor and the guarantor, have suffered no detriment greater than that anticipated under their original agreements with the secured creditor. This is true even though the guarantor's right to statutory reimbursement from the principal obligor may have been impaired by the *subsequent* nonjudicial sale of the secured property.

Civil Code section 2847 provides as follows: "If a surety satisfies the principal obligation, or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what he has disbursed, including necessary costs and expenses; but the surety has no claim for reimbursement against other persons, though they may have been benefited by his act, except as prescribed by the next section." Under the *Gradsky* rationale, any claim for reimbursement by the guarantor pursuant to section

---

[8]The *Aruba* court found an express *Gradsky* waiver in the agreements executed by the guarantor. This finding, however, does not persuade us to abandon the rationale adopted by *Aruba* since it was only an alternative ground used by the court in rejecting the plaintiff's claim for restitution.

2847 would not constitute an action "upon a note" within the meaning of Code of Civil Procedure section 580d. Accordingly, where a creditor elects to first proceed against the collateral securing a guaranty, the resulting reimbursement claim by the guarantor against the debtor cannot be termed an action for a deficiency under section 580d.

Applying these principles to the case under review, nothing barred the Kruegers from asserting a reimbursement claim, at least prior to the nonjudicial foreclosure of GRD's real property, to recover the loss they suffered as the result of the Bank's sale of the pledged PRC stock. We think it clear that any impairment of the security covering the principal resulted from the Kruegers' delay in seeking reimbursement pursuant to Civil Code section 2847. Under the circumstances they may not now raise the bar of estoppel to compel the Banks to return the proceeds of the stock sale.

■ The Kruegers alternatively argue that they were exonerated from further liability on their guarantees and entitled to the return of all 296,500 shares of PRC stock because the Banks, without notice, authorized GRD to sell $85,000 worth of construction equipment that constituted a portion of the collateral securing the underlying debt. For this proposition the Kruegers rely on section 9504, subdivision (3) of the California Uniform Commercial Code. That statute, applicable to sales of encumbered personal property, compels a creditor to provide notice to a debtor in writing of the time and place of any public or private sale of the secured collateral. Failure to comply with this procedural requirement precludes the recovery of any deficiency against the principal obligor. (See *Atlas Thrift Co.* v. *Horan* (1972) 27 Cal.App.3d 999 [104 Cal.Rptr. 315, 59 A.L.R.3d 389]; *Barber* v. *Le Roy* (1974) 40 Cal.App.3d 336 [115 Cal.Rptr. 272].) Notice may not be waived by the debtor prior to default on his obligation. (Cal. U. Com. Code, § 9501, subd. (3)(b).)

Once again we find this argument to be unpersuasive. The Banks correctly point out that the provisions of California Uniform Commercial Code section 9504 pertain solely to sales of collateral by a secured creditor, not a debtor. Here, of course, the sale of the equipment in question was made by GRD and not the Banks. Even were we to assume that a secured creditor must provide a guarantor with notice of sale whenever the debtor sells his own property, we could not conclude that the lack of such notice to the Kruegers relieved them of liability under the guarantees or entitled them to a return of the stock sale proceeds.

The trial court expressly found that in executing their general continuing guarantees the Kruegers gave advance consent to subsequent modifications, material or immaterial, of the GRD loan obligations. Such consent precludes

the Kruegers from now claiming they are exonerated on their obligations under the guarantees. (See Civ. Code, § 2819; *Southern Cal. First Nat. Bank* v. *Olsen* (1974) 41 Cal.App.3d 234, 240 [116 Cal.Rptr. 4]; *Common Wealth Ins. Systems, Inc.* v. *Kersten* (1974) 40 Cal.App.3d 1014, 1029 [115 Cal.Rptr. 653].) We think this consent takes on special meaning since Robert Krueger was himself a director, shareholder and after 1975, a president of GRD. Because of Krueger's position, notice of the GRD sale should be imputed to him as a matter of law.

The Kruegers next complain that, regardless of the number of shares they are entitled to, the trial court erred in limiting their recovery to the value of the pledged stock on the date of conversion, plus interest. Based upon the record before us, we can only conclude that the trial court's ruling was proper.

Pursuant to Civil Code section 3336, a plaintiff in an action for conversion may recover either (1) the value of the property at the time of conversion, with interest, or (2) "an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; . . ." In addition to either of the above, a plaintiff may also receive a fair compensation for the time and money properly expended in pursuit of the property.

"Although the first and specific statutory alternative—the value with interest—is the typical measure [of damages], the other general alternative is sometimes applied." (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 912, p. 3199.) Generally speaking, the determination of damages under the alternative provision of section 3336 is resorted to "only where the determination on the basis of value at the time of conversion would be manifestly unjust." (*Myers* v. *Stephens* (1965) 233 Cal.App.2d 104, 116 [43 Cal.Rptr. 420].)

A plaintiff seeking recovery under the alternative provision of the statute must therefore plead and prove the existence of ' "special circumstances which require a different measure of damages to be applied." ' (*Betzer* v. *Olney* (1936) 14 Cal.App.2d 53, 61 [57 P.2d 1376].) Having done so, the trier of fact must then determine "whether it was reasonably forseeable to a prudent person, having regard for the accompanying circumstances, that injury or damage would likely result from his wrongful act." (*Myers* v. *Stephens, supra,* 233 Cal.App.2d at pp. 119-120.)

In the case at bench, the trial court expressly found that "[t]he proper amount of damages for the 15,500 shares under Civil Code section 3336 is

either the value of the shares at . . . [the date of conversion] plus interest or the return of the shares . . . . The former is more favorable to the Kruegers in their judgment." The form of the record being what it is (a judgment roll appeal), we have no way of knowing what evidence the court considered in reaching the above finding and awarding damages based upon the stocks' value on the date of conversion. Nevertheless, we must assume that substantial evidence supports the court's ruling on this issue. (See *White* v. *Jones, supra*, 136 Cal.App.2d at pp. 569-571.) Moreover, implicit within this crucial finding is the determination that the Kruegers failed to establish the existence of special circumstances sufficient to invoke the alternative provisions of section 3336.

Finally, we turn to Bank of America's cross-appeal which questions whether the Kruegers were the prevailing parties within the meaning of Civil Code section 1717, and Code of Civil Procedure section 1032, and thus entitled to an award of fees and costs.

■ It has long been recognized that attorney's fees are generally not recoverable as costs unless authorized by either statute or agreement. (See *Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 127 [158 Cal.Rptr. 1, 599 P.2d 83]; *International Industries, Inc.* v. *Olen* (1978) 21 Cal.3d 218, 221 [145 Cal.Rptr. 691, 577 P.2d 1031].)

Civil Code section 1717 provides in relevant part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements . . . . [¶] (b)(1) The court, upon notice and motion by a party, shall determine who is the prevailing party, whether or not the suit proceeds to final judgment . . . . [T]he prevailing party shall be the party who is entitled to recover costs of suit."

■ Based upon the language of the statute, Bank of America maintains that since the Kruegers did not prevail on any of their causes of action for damages and were only awarded a declaratory judgment exonerating them from liability on the guarantees, they cannot be deemed a "prevailing party." The bank further argues that "because the declaration of non-liability is no more than the equivalent of the denial of recovery to Bank of America on its cross-complaint against plaintiffs for the deficiency under the continuing guaranty, [t]he declaration of non-liability had no effect on the net result of the judgment."[9] We reject each of these contentions.

---

[9]Bank of America concedes that the continuing guaranty executed by the Kruegers contains a provision requiring payment of attorney's fees in the event legal proceedings are necessary.

Prior to its amendment by the Legislature in 1981, section 1717 specified that the prevailing party was the party in whose favor final judgment was rendered. (See Stats. 1968, ch. 266, § 1, p. 578.) The current version of the statute, however, eliminates that definition and requires the trial court to determine who is the prevailing party, upon notice and motion by a party, regardless of whether the suit proceeds to final judgment. Under existing law, then, the court is given wide discretion in determining which party has prevailed on its cause(s) of action. Such a determination will not be disturbed on appeal absent a clear abuse of discretion.

"As a general rule, where claims and counterclaims arise in connection with a contract containing an attorney's fees provision, the party who obtains a favorable judgment is deemed to be the prevailing party, even though he did not successfully obtain all the relief which he sought in the action." (*Epstein* v. *Frank* (1981) 125 Cal.App.3d 111, 124 [177 Cal.Rptr. 831].) The Kruegers fall within the parameters of this rule. Although they failed to prevail on virtually all causes of action stated in their complaint, they were exonerated from any further liability on the guarantees. This was no hollow victory. By obtaining a declaratory judgment in their favor, the Kruegers were relieved of a significant liability that otherwise would have continued to exist. (Cf. *Wilhite* v. *Callihan* (1982) 135 Cal.App.3d 295 [185 Cal.Rptr. 215].)

Since an award of contractual attorney's fees is to be governed by equitable principles (*International Industries, Inc.* v. *Olen, supra,* 21 Cal.3d at p. 224), we deem the Kruegers to be prevailing parties in the underlying action and find unpersuasive the authority relied upon by Bank of America to support a contrary conclusion.

Lastly, it must be pointed out that the same principles which apply to attorney's fees are also applicable to the awarding of costs under Code of Civil Procedure section 1032. (*Epstein* v. *Frank, supra,* 125 Cal.App.3d at p. 126.)

We conclude therefore that the trial court did not abuse its discretion in awarding the Kruegers both fees and costs.

The judgment is affirmed.

Beach, J., and Gates, J., concurred.

A petition for a rehearing was denied August 11, 1983, and the petition of plaintiffs and appellants for a hearing by the Supreme Court was denied September 29, 1983.