**BANK OF THE WEST, Plaintiff,**

v.

**COMMERCIAL CREDIT FINANCIAL SERVICES, INC., Defendant.**

**No. C-85-3815-WWS.**

United States District Court, N.D. California.

Feb. 25, 1987.

James B. Wright, Peter G. Bertrand, Ellen J. Peterson, Buchalter, Nemer, Fields, Chrystie & Younger, San Francisco, Cal., for plaintiff.

John F. Taylor, Mark R. Reiff, Taylor & Stanley, San Francisco, Cal., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OF OPINION

SCHWARZER, District Judge.

In this diversity action, plaintiff Bank of the West ("Bank") seeks to recover the value of accounts receivable which were assigned to and collected by defendant Commercial Credit Financial Services, Inc. ("Commercial Credit"). The accounts in question were generated by a beverage importing and wholesaling business. Bank claims that its debtor, Allied Canners and Packers, Inc. ("Allied"), operated the business and granted Bank a security interest in the business's accounts senior to that of Commercial Credit.

The action has been submitted by the parties for decision on the written record.[1] The following constitutes the Court's findings of fact and conclusions of law.

## FACTUAL BACKGROUND

### A. The Financing Agreements

On April 5, 1982, Bank entered into a Loan and Security Agreement with Allied, a wholly-owned subsidiary of Boles World Trade Corporation ("BWTC"). (Complaint, ex. A.)[2] Pursuant to that agreement, Bank lent Allied $4,000,000 and took a security interest in substantially all of Allied's assets. (*Id.*) Bank perfected its interest by filing a financing statement with the California Secretary of State on April 7, 1982.

In 1983, Bank and Allied entered into negotiations to reschedule payments under the loan. These negotiations lead to the execution of a rescheduling agreement on January 13, 1984. (Complaint, ex. C.) Under a Security Agreement executed at the same time, Allied granted Bank a security interest in all of Allied's "present and hereafter acquired" accounts receivable. (Bertrand 1/9/87 decl., ex. A) In the Security Agreement, Allied represented that it would not assign any collateral covered by the agreement. The agreement provided that a breach of any representation was an event of default.

On January 10, 1984, Commercial Credit entered into a factoring agreement with Boles & Co., Inc. ("BCI"), another subsidiary of BWTC.[3] (Drasser 9/26/86 decl., ex.

---

1. Commercial Credit requests a limited evidentiary hearing on the issue of whether it had notice of the Bank's interest in the accounts. For the reasons given *infra,* a hearing is unnecessary.

2. Citations to the pleadings and papers submitted by the parties take the following form: (Document, date—where necessary to distinguish cited document from other documents, page or paragraph number, exhibit ("ex.") number, page number within exhibit). Depositions and declarations are cited by the last name of the deponent and the abbreviation "depo." or "decl."

3. BWTC officers have at various times represented that Allied was a subsidiary of BCI. (*See, e.g.,* Drasser depo., ex. 2.) Corporate records, however, indicate that Allied was di-

A.) The agreement provided that Commercial Credit would purchase accounts from BCI at a discount from their face value and then collect the sums due from BCI's customers. After collection, Commercial Credit would remit to BCI the discounted amount less interest and a commission. Commercial Credit perfected its interest in the accounts by filing a financing statement on January 5, 1984. (Drasser 9/26/86 decl., ex. C.)

B. *Ownership of the Beverage Business*

Before August 1983, BWTC was named Boles & Co., Inc. and conducted a beverage importing and wholesaling business as an unincorporated division. (Boles depo. vol. I, ex. 1.) On August 15, 1983, the board of directors of that corporation voted to change its name to BWTC and to contribute the beverage business to another of a group of commonly-owned entities to be called Boles & Co., Inc. (BCI).[4] (*Id.*) On the same date, the directors of a company named Minerals Trading Corporation voted to change its name to Boles & Co., Inc. (BCI) and to accept the transfer of the beverage business assets. (Reiff 1/9/87 decl., ex. I, 700728.) Both transfers were conditioned on BCI's receipt of the necessary licenses. But counsel later advised the companies that a transfer of licenses would be unnecessary because BCI's name and address already appeared on the existing licenses. (Taylor depo., 41–44.) Duke L. Golden, President of Allied and BCI in early 1984, Christopher d'Arnaud-Taylor, Chief Executive Officer of BCI, and Andrew A. Lomas, President of BCI and Allied beginning in May 1984, have all stated that they believed BCI was conducting the beverage business as of the date of the factoring agreement with Commercial Credit. (Golden depo., 32–34; Taylor depo., 27–28; Lomas 1/6/86 decl., ¶¶ 3, 4.)

As part of the rescheduling agreement between Allied and Bank, BWTC agreed to transfer the beverage business to Allied. The following is a chronology of events relevant to a determination of whether and when that transfer occurred:

| | |
|---|---|
| 10/20/83 | Minutes of a BWTC Finance Committee meeting state that "[b]y moving the Beverage Division into Allied, it had been possible to reach agreement with the Bank...." (Boles depo., ex. 2.) |
| 12/6/83 | Allied's board votes to change Allied's name to Boles International Beverage Company ("BIBCO"). (*Id.*, ex. 3.) |
| 12/12/83 | Minutes of a meeting of the BWTC board of directors indicate that the transfer has occurred. (*Id.*, ex. 5.) |
| 1/13/84 | Boles "consider[s] the transfer to have taken place as of" this date. (*Id.* vol. I, 59.) |
| 1/16/84 | The first account is assigned to Commercial Credit. The invoice representing the account lists Boles & Company, Inc. as the account creditor. (Broyde 1/9/87 decl., ex. A.) |
| 2/1/84 | A memorandum from Golden states that the transfer is effective as of this date. (Lomas 9/26/86 decl., ex. A.) |
| 3/84 | Lomas believes Allied has begun operating the beverage business by March 1984. (Lomas 1/3/86 decl., ¶¶ 3, 4).[5] |
| 3/1/84 | BWTC warrants to Bank that Allied is conducting the beverage business. (Boles depo. vol. I, 173, ex. 16.) |
| 3/28/84 | Martina J. McKee, an inspector for the Federal Bureau of Alcohol, Tobacco, and Firearms is assigned to conduct an investigation into BWTC's import licensing. (McKee depo., 13.) |
| 4/9/84 | A memorandum from Leonard Quaranto, BWTC General Counsel, to another BWTC officer states that either BCI or Allied operates the beverage business. (Reiff decl., ex. L.) George Tingo, outside counsel to BWTC, informs McKee that he has been hired to straighten out the "mess" and determine which BWTC subsidiary is |

rectly owned by BWTC at least until June 8, 1984. On that date, the board of directors of BWTC approved the transfer of Allied to BCI. (Reiff 1/9/87 decl., ex. M.)

4. Robert P. Zager, who served as independent counsel to BWTC from 1982 through February 1984 has stated in a declaration that the transfer was one of several possible plans BWTC officers considered in August 1983 to conceal assets from Bank. (Zager 1/9/87 decl., ¶ 5.) He states that to the best of his knowledge the transfer never occurred. (*Id.*, ¶ 6.)

5. Bank has offered the declaration of Lomas that he became familiar with the books and records of Allied in February 1984. He states that those records indicate that BWTC imported all of the beverage inventory and transferred it to Allied, which then sold the inventory to American wholesalers. (Lomas 1/9/87 decl., ¶¶ 10, 12.)

To prove the contents of a writing, the original writing is ordinarily required. Fed. R. Evid. 1002. Bank has not offered an adequate explanation for its failure to produce the original books and records of Allied. *See id.* 1004. These statements by Lomas will therefore not be considered.

conducting which business. (McKee depo., ex. 2.)

**5/1/84** Lomas becomes President of BCI. (Lomas 1/9/87 decl., ¶ 2.)

**5/3/84** Quaranto states in another memorandum that Allied should be the applicant for the federal import license. (Boles depo., ex. 21.)

**5/16/84** Lomas becomes President of Allied. (Lomas 1/9/87 decl., ¶ 2.) For the first time, Commercial Credit receives an invoice with the name Boles & Company, Inc. crossed out. (Broyde 1/9/87 decl., ex. B)

**5/17/84** Allied, under the name of BIBCO, signs a supply contract with Coopers brewery, one of three from whom the beverage business regularly purchases. (Cooper decl., ex. 3.)

**5/24/84** Allied, under the name BIBCO, signs a supply contract with Belhaven brewery. (Lomas 1/9/87 decl., ex. 3.)

**6/5/84** Some beverage invoices bear the name Boles & Company, Inc. until this date. (Broyde 1/9/87 decl., ex. A.)

**6/11/84** A certificate of amendment changing Allied's name to BIBCO is filed with the California Secretary of State.

**6/18/84** BIBCO makes earliest application for state license to distribute alcohol. (Lomas 1/9/87 decl., ex. 7.)

**6/29/84** A federal import license is granted to BIBCO. (McKee depo., ex. 4.)

**6/30/84** A financial statement for the first six months of 1984 shows "Boles Beverage" with $1,300,000 in income. "Boles California" has no income. Boles Beverage is Allied/BIBCO. Boles California is BCI. (Lomas 1/9/87 decl., ¶¶ 13, 14, ex. 1, 2.)

**7/11/84** Greenall Whitley, the beverage business's third supplier, is notified that BIBCO is conducting the beverage business. (Reiff 1/9/87 decl., ex. N.)

**8/16/84** For the first time, a beverage invoice lists BIBCO as the account creditor. (Broyde 1/9/87 decl., ex. C.)

Thus, as of the end of April 1984, all invoices representing beverage accounts continued to be issued in the name of Boles & Company, Inc., and licenses and contracts with suppliers were in that name as well. The only financial statement available during this period shows Allied and Boles Beverage as separate entities, and there was confusion among BWTC personnel as to which company operated the beverage business.

As of the end of May, most beverage invoices had the Boles & Company, Inc. name crossed out, but some were still issued in that name. Two of the contracts with suppliers were in BIBCO's name. BWTC personnel had decided that Allied should conduct the beverage business, but the transfer of the federal import license and state wholesaling licenses into BIBCO's name was not completed until the end of June. As of that time, Allied had offi-

cially changed its name to BIBCO, although invoices were not issued in BIBCO's name until August 1984.

## C. *The Factoring Transaction*

From January through September 1984, Commercial Credit purchased beverage accounts from BCI with a face value of $1,900,000, for which Commercial Credit paid $1,300,000. (Drasser 9/26/86 decl., ¶ 6.) Beverage invoices directed account debtors to pay Commercial Credit. (Broyde 1/9/87 decl.) Most account debtors did so, and if they did not, BCI endorsed their checks and delivered them to Commercial Credit. (Drasser 9/26/86 decl., ¶ 8.) After collecting accounts and remitting proceeds to BCI, Commercial Credit retained only the amount it originally paid BCI for the accounts plus $60,000 in interest and commissions. (*Id.*, ¶ 6.) The factoring agreement terminated on October 15, 1984. After that date, Commercial Credit retained no further collections from account debtors, except to cover one October 31, 1984 interest payment. (*Id.*, ¶ 9.)

All amounts paid by Commercial Credit to Allied were deposited in a bank account which served as the operating account for the beverage business. (Lomas depo., 45–47, 82.) Funds from that account were used to make payments to Bank, to purchase new beverage inventory, and to pay the beverage business's operating expenses. (Boles depo. vol. I, 62–63; Lomas depo., 42–45.)

On November 29, 1984, Commercial Credit was served with a writ of possession directing it to convey proceeds from the beverage accounts to Bank, and it complied. (Drasser 9/26/86 decl., ¶ 10.)

## DISCUSSION

### A. *Bank's Priority*

Article Nine of the Uniform Commercial Code (Division Nine of the California Commercial Code) governs the creation of and priority among security interests in personal property. Its provisions apply to the factoring of accounts. Cal.Com.Code § 9102 (West Supp.1987). Under Article

Nine, determining priority among competing security interests in the same collateral requires a three-step analysis.

First, the court must determine whether the security interests have "attached" to the collateral. *Id.* § 9203(1). Attachment is a prerequisite to the enforcement of any security interest. *Id.* A security interest has attached if

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral....

(b) Value has been given. [And]

(c) The debtor has rights in the collateral.

*Id.*

■ Second, whether one or both of the security interests have been perfected must be ascertained. Perfection is "some action, either filing or possession, which would put a diligent searcher on notice of the secured party's claim." J. White & R. Summers, Uniform Commercial Code § 23–5, at 919 (2d ed. 1980). In order to perfect a security interest in accounts receivable, a secured party must file a financing statement with the Secretary of State. Cal. Com.Code §§ 9302(1), 9401(1)(c) (West Supp.1987).

Third, the Code's priority rules must be applied. *See id.* § 9312.

1. *Commercial Credit's Security Interest*

a. *Attachment.* Whether Commercial Credit's security interest attached to the beverage accounts depends on whether BCI, Commercial Credit's debtor, "had rights in the collateral." That Commercial Credit satisfied the other two requirements for attachment is undisputed. Bank contends, however, that BCI never owned or operated the beverage business and therefore never had any right to payment from the account debtors.

■ It is not necessary to answer the question whether BCI owned the beverage business in order to resolve the attachment issue. "[A] debtor who does not own collateral may nonetheless use the collateral for security, thereby obtaining 'rights in the collateral,' when authorized to do so by the actual owner of the collateral." *K.N.C. Wholesale, Inc. v. AWMCO Inc.,* 56 Cal. App.3d 315, 319, 128 Cal.Rptr. 345, 348 (1976). BCI had at least implied authority to assign the beverage accounts throughout the course of the factoring transaction. Invoices issued by BCI to beverage account debtors directed them to pay Commercial Credit. Any payments not made directly to Commercial Credit were forwarded to Commercial Credit by BCI. Amounts remitted by Commercial Credit were deposited into the beverage business's bank account and used for its operations. None of these events could have occurred without the acquiescence and at least tacit approval of the company which owned the beverage business. Commercial Credit therefore had an enforceable security interest in all of the accounts it factored.

■ b. *Perfection.* Whether BCI owned the beverage accounts is relevant to resolution of the perfection issue. In order to perfect a security interest in accounts receivable, a secured party must file a financing statement which, among other things, names the debtor. Cal.Com.Code § 9402(1) (West Supp.1987).

"Where the debtor and the owner of collateral are not the same person the term 'debtor' means the owner of the collateral in any provision of the division dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires; ..." (§ 9105, subd. (1)(d).) The purpose of the filing requirements for perfection of security interests is to guarantee that third parties will have notice of existing security interests in collateral, thus protecting credit transactions. In cases where the "debtor" is not the owner but has obtained his rights in the collateral due to the owner's permission, a financing statement in the name of the "debtor" alone fails to give subsequent creditors of the owner notice that the collateral is subject to a prior security interest. To avoid such potential

fraud or misrepresentation, the term "debtor" as used in section 9402 must be taken as referring to both the actual debtor and the owner of the collateral, i.e., *both* names are required on the financing statement to perfect the security interest.

*K.N.C. Wholesale*, 56 Cal.App.3d at 319–20, 128 Cal.Rptr. at 348–49 (citations omitted). Thus, if BCI, the debtor named in Commercial Credit's financing statement, never owned the accounts, then Commercial Credit never had a perfected security interest.

 The facts support Commercial Credit's contention that BCI owned and operated the beverage business at the time the factoring agreement was signed. As the court in *K.N.C. Wholesale* noted, the reason for requiring that a financing statement contain the name of the owner of collateral is to insure that subsequent creditors receive notice of any perfected security interests in the collateral. For purposes of Article Nine, a debtor therefore owns collateral if the objective indicia of ownership would be sufficient to place a secured party on notice that financing statements in that debtor's name should be searched for prior security interests.[6] In this case, all objective indicia of ownership pointed to BCI as owner of the accounts. Invoices, contracts with suppliers, and licenses were all in BCI's name. The officers involved with BCI's operations believed and presumably would have stated that BCI conducted the business. Bank argues that the licenses were obtained and the contracts were originally signed by BWTC when its name was Boles & Company, Inc. But the argument is pointless since BWTC transferred the name along with the business to BCI. Commercial Credit therefore had a perfected security interest at the time the factoring agreement was signed.

Bank contends that Commercial Credit's interest became unperfected after the transfer of the beverage business to Allied. It is unnecessary to resolve this issue. As noted below, Bank's security interest became superior to Commercial Credit's after the transfer whether or not Commercial Credit's interest was perfected.

### 2. Bank's Security Interest

a. *Attachment.* Bank's security interest attached to the accounts when Allied acquired "rights to [that] collateral." It is not disputed that Allied acquired the rights to the beverage accounts upon the transfer of the beverage business to Allied.

b. *Perfection.* Similarly, Bank's security interest under its 1982 financing statement became effective as to the beverage accounts only upon the date of that transfer. A financing statement, to be effective, must name the owner of the collateral. Bank's financing statement named only Allied as the debtor, and Allied did not become the owner of the collateral until the time the beverage business was transferred to Allied.

### i. Date of Transfer

The pivotal issue therefore is when the beverage business was transferred to Allied. Since Bank's claim depends on proof of Allied's ownership of the accounts, it has the burden to prove by a preponderance of the evidence when that ownership was acquired. The evidence on that issue is collected in the chronology set forth above. It reflects an intention to transfer the beverage business to Allied as early as October 1983 and ongoing discussions of the subject during the following months. But the statements of the participants as to when Allied actually began to operate the beverage business are vague, confused, and inconsistent. Objective indicia of a transfer do not begin to appear until May when two purchase agreements were signed by Allied and the BCI name was crossed out on an invoice. Not until June did Allied officials change its name or obtain licenses.

---

**6.** A debtor's title may be subject to challenge under other provisions of the Commercial Code and other law. *See* Sanford, *Debtor's Rights in Collateral as a Requirement for Attachment of a* *Security Interest Under the Uniform Commercial Code*, 26 S.D.L.Rev. 163 (1981); *see, e.g., infra* (challenges by Commercial Credit to Allied's title). Bank raises no such challenge.

It is obvious that there is no evidence to establish a specific date as *the* date of transfer of the business. The transfer appears to have been an ongoing process which, though not consummated on an ascertainable date, eventually culminated in a predominance of indicia of Allied's ownership. Bank has sustained its burden of proving by a preponderance of the evidence that a predominance of indicia existed by the end of June 1984. Accordingly, the Court finds that BCI transferred the beverage business to Allied effective as of July 1, 1984.

### ii. *Other Challenges to Allied's Ownership*

Commercial Credit raises a number of challenges to Allied's title to the accounts. None of the alleged defects, however, suffices to defeat the Bank's perfected security interest in the accounts.

■ Commercial Credit first argues that failure to obtain approval of BCI's board of directors and shareholders invalidates the transfer. Cal.Corp.Code § 1001 (West 1977) provides that a transfer of all or substantially all of a corporation's assets must be approved by the corporation's board of directors and outstanding shares. Commercial Credit points out that the beverage business was the only significant asset owned by BCI and that BCI's directors and shareholders never approved the transfer to Allied. Some California cases have stated in dicta that a creditor of a transferring corporation may have a transfer set aside under § 1001's predecessor. *See, e.g., Bickston v. Federal Firearms Corp.,* 227 Cal.App.2d 574, 38 Cal.Rptr. 793, 796 (1964) (plaintiff was both shareholder and creditor); *Solorza v. Park Water Co.,* 86 Cal.App.2d 653, 658, 195 P.2d 523 (1948) (suit brought by shareholder). But in *In re Long Constr. Co.,* 208 Cal.App.2d 726, 25 Cal.Rptr. 509 (1962), a suit brought by a creditor, the court held that a creditor could not attack a transfer on the basis of that provision of the Corporations Code.

The result in *Long* is sound and, this court believes, would be followed by the California Supreme Court. Section 1001, like its predecessor, allows shareholders to approve a transfer before or after it takes place. *See Long,* 208 Cal.App.2d 726, 25 Cal.Rptr. at 514. A transfer not in compliance is therefore voidable at the shareholders' option, not void as to all creditors.

■ Commercial Credit next argues that the transfer to Allied was invalid under Cal.Civ.Code § 3440 (West Supp.1987). That section provides that a transfer of personal property "not accompanied by an immediate delivery followed by an actual and continued change of possession of the property is void as against the transferor's creditors." This section is not applicable for two reasons. First, it does not apply to transfers of things in action. Cal.Civ.Code § 3440.1 (West Supp.1987). Commercial Credit seeks to avoid the transfer of accounts, which are things in action. Second, § 3440

> does not affect the rights of a secured party who for value and in good faith acquires a security interest in the transferred personal property from the transferee, or from the transferee's successor in interest, if the transferor is no longer in possession of the personal property at the time the security interest attaches.

*Id.* § 3440.5(a). The Commercial Code[7] defines giving value to include acquiring as security for a preexisting claim. Cal.Com. Code § 1201(44) (West Supp.1987). Good faith is defined as "honesty in fact." *Id.* § 1201(19). Bank gave value and acted in good faith under these definitions. Moreover, by the time Bank acquired its security interest in the beverage accounts, BCI, Commercial Credit's debtor, no longer had possession of the beverage business. Assuming the transfer was defective under this section, the Bank's security interest is unaffected.

■ Commercial Credit also contends that the transfer to Allied was a fraudulent conveyance. California has adopted the

---

**7.** The use of Code terms such as security interest, good faith, and value indicates that Code definitions should be used.

Uniform Fraudulent Transfer Act ("UFTA"). *See* Cal.Civ.Code §§ 3439–3439.11 (West Supp.1987). Under the UFTA, a creditor of a debtor which has engaged in a fraudulent transfer may avoid the transfer. *Id.* § 3439.07(a)(1). The creditor may obtain relief against the first transferee or "[a]ny subsequent transferee other than a good faith transferee who took for value." *Id.* § 3439.08(b). Value is given under the UFTA, if an antecedent debt is secured. *Id.* § 3439.03. If the transfer of the beverage business to Allied was fraudulent, Bank is a subsequent transferee. By accepting the beverage business accounts as security for Allied's existing debt, Bank gave value. There is no evidence that Bank acted in bad faith. Commercial Credit may therefore not avoid the transfer under the UFTA.

■■■■■ Finally, Commercial Credit argues that it may avoid the transfer because BCI and Allied failed to comply with the bulk sales notice requirements of Article Six of the Uniform Commercial Code (Division Six of the California Commercial Code). Article Six defines a bulk sale as a transfer of a substantial part of the inventory of an enterprise the principal business of which is the sale of merchandise. Cal. Com.Code § 6102 (West Supp.1987). A bulk sale is void against a creditor of the transferor unless notice is published in accordance with Article Six's requirements. *Id.* § 6105. Article Six does not apply to transfers of accounts receivable. U.C.C. § 6–102 comment 3. Moreover, if accounts are transferred along with property to which Article Six applies, Article Six's remedies are available only with respect to the transfer of the covered property. J. White & R. Summers, *supra*, § 19–2, at 761–62. In addition, a purchaser for value in good faith without notice of noncompliance with Article Six takes free of any defect in title arising because of noncompliance. Cal. Com.Code § 6110 (West 1964). As already noted, Bank qualifies as a good faith purchaser for value. There is no evidence to indicate Bank knew of the failure of BCI and Allied to comply with Article Six. The bulk transfer law therefore has no effect on the Bank's security interest.

■■■ In addition to challenging Allied's title, Commercial Credit claims that whatever interest the Bank had became unperfected on April 6, 1984 under Cal.Com.Code § 9402(7) (West Supp.1987). That section provides that:

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement or an appropriate amendment to the filed financing statement is filed before the acquisition of the collateral by the debtor.

Commercial Credit argues that under the second sentence Bank's financing statement became seriously misleading four months after the directors voted to change Allied's name to BIBCO. But a corporation's name change is not effective until it files a certificate of amendment with the Secretary of State. *See* Cal.Corp.Code § 905 (West 1977). Allied did not file a certificate until June 1984. Allied may have used BIBCO as a trade name before June 1984, but under the first sentence of § 9402(7), the financing statement was sufficient as long as it contained Allied's corporate name.

Thus, Bank had a perfected security interest as of July 1, 1984. That interest continued to be perfected at all relevant times.

### 3. *Priority*

■■■ Priority between Bank's and Commercial Credit's security interests is governed by Cal.Com.Code § 9312(5) (West Supp.1987). Section 9312(5) provides that

(a) Conflicting security interests rank according to priority in time of filing or

perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

(b) So long as conflicting security interests are unperfected, the first to attach has priority.

Before the transfer of the beverage business to Allied, Commercial Credit had a perfected security interest in the beverage accounts and Bank had at most an unperfected security interest. Commercial Credit therefore had priority. After the transfer, Bank had a perfected security interest in all accounts thereafter created. Since Bank's filing in January 1982 predated both Commercial Credit's filing and the perfection of Commercial Credit's security interest, Bank had priority in accounts created after July 1, 1984.

Commercial Credit contends that the Commercial Code's priority rules should not apply to this dispute because Bank subordinated its interest to Commercial Credit's. *See* Cal.Com.Code § 9316 (West 1964). This contention is based on the following paragraph in the rescheduling agreement:

> Upon the request of Debtor, subject to the terms hereof, and provided that Debtor is in full, faithful and timely compliance with each of the terms of this Agreement and the Security Agreement described herein below, Bank agrees to execute a subordination agreement or agreements ... in favor of any institutional lender for the purposes of financing Debtor's activities in the ordinary course of business, in the form of revolving credit arrangements, providing working capital, secured by a security interest in Debtor's accounts receivable and/or inventory (and such other lenders as may be satisfactory to Bank in its sole discretion, which discretion shall not be exercised unreasonably.)

The paragraph clearly requires execution of a separate subordination agreement. Commercial Credit acknowledges that no such agreement was ever executed. It nonetheless argues that it is a third-party beneficiary of Bank's promise to subordinate.

The cases cited by Commercial Credit do not support its position. Most of the cases cited involved agreements to subordinate that did not require execution of a separate subordination agreement. *See, e.g., In re AM International, Inc.,* 46 B.R. 566 (Bankr.M.D.Tenn.1985). The one exception is *In re Thorner Manufacturing Co.,* 4 U.C.C.Rep.Serv. 595 (Bankr.E.D.Pa.1967). In that case, the loan agreement between the debtor and the lender provided that the lender's right to payment would be subordinate to certain subsequent creditors and that the lender would execute a subordination agreement in favor of a subsequent creditor upon request. The lender in that case conceded that its rights were subordinate to those of a subsequent creditor even though no subordination agreement had been executed. *Id.* at 599. The court indicated, however, that had the creditor not conceded the point, the court would have held that there was no subordination in the absence of a separate agreement. *Id.* Thus, Commercial Credit can cite no authority for ignoring the clear language of the rescheduling agreement. Priority between its interest and Bank's interest is governed by the Commercial Code. Under the Code, Bank's interest became superior on July 1, 1984.

### B. *Bank's Recovery*

#### 1. *Conversion Cause of Action*

 Under Cal.Com.Code § 9306(2) (West Supp.1987), "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor." A secured party may "in an appropriate case" maintain an action for conversion to enforce this continuing interest. U.C.C. § 9–306 comment 3; *see also Taylor Rental Corp. v. J.I. Case Co.,* 749 F.2d 1526, 1529 (11th Cir.

1985); *Beneficial Fin. Co. v. Colonial Trading Co.*, 43 Pa.D. & C.2d 131 (1967); J. White & R. Summers, *supra*, § 26–7, at 1103–04. The elements of a cause of action for conversion are (1) plaintiff's right to immediate possession of the property, (2) defendant's wrongful disposition of plaintiff's property rights, and (3) damages. *Hartford Fin. Corp. v. Burns*, 96 Cal. App.3d 591, 598, 158 Cal.Rptr. 169, 172 (1979). A secured party has an immediate right to possession of collateral only if the debtor is in default. *Id.* at 599, 158 Cal. Rptr. at 173; *see* Cal.Com.Code § 9503 (West 1964).

Allied undertook in the January 1984 Security Agreement with the Bank that it would not assign any collateral covered by the agreement. The Security Agreement made the breach of any representation an event of default. Under these provisions, Allied was in default as soon as BCI began assigning accounts owned by Allied. Bank therefore had an immediate right to possession of all accounts assigned after July 1, 1984.

The collection of accounts is equivalent to the sale of tangible collateral, and the sale of collateral is generally sufficient interference with a secured party's rights to constitute conversion. Nickles, *Enforcing Article Nine Security Interests Against Subordinate Buyers of Collateral*, 50 Geo.Wash.L.Rev. 511, 532 (1982). Commercial Credit therefore converted all accounts assigned and collected after July 1, 1987.

### 2. *Amount of Damages*

Under Cal.Civ.Code § 3336 (West 1970), the measure of damages for conversion is either (1) the value of the property at the time of conversion, or (2) "an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of."

Although the first part of section 3336 appears to provide for alternative measures of recovery, the first of the two measures, namely the value of the property converted at the time and place of conversion with interest from that time, is generally considered to be the appropriate measure of damages in a conversion action. The determination of damages under the alternative provision is resorted to only where the determination on the basis of value at the time of conversion would be manifestly unjust. *Myers v. Stephens*, 233 Cal.App.2d 104, 43 Cal.Rptr. 420, 430 (1965) (citations omitted); *see also Krueger v. Bank of America*, 145 Cal.App.3d 204, 193 Cal.Rptr. 322, 329 (1983). As Bank points out, California courts have generally awarded the alternative measure when an award of the value of the converted property would inadequately compensate the plaintiff. *See, e.g., Lint v. Chisolm*, 121 Cal.App.3d 615, 177 Cal.Rptr. 314, 319 (1981); *Myers*, 233 Cal. App.2d 104, 43 Cal.Rptr. at 430–31. There is, however, nothing in the statute to indicate that an award of damages for conversion may not be limited as well as enhanced by the alternative measure when justice so requires. *See Tyrone Pacific Int'l, Inc. v. MV Eurychili*, 658 F.2d 664, 666–62 (9th Cir.1981). Bank seeks to recover all amounts collected by Commercial Credit from beverage account debtors after the transfer of the beverage business to Allied. Because of the nature of accounts receivable financing, an award of that amount would be "manifestly unjust."

Accounts receivable subject to security interests are in a constant state of flux. *Grain Merchants v. Union Bank and Savings Co.*, 408 F.2d 209, 215 (7th Cir.), *cert. denied*, 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969); Coogan & Gordon, *The Effect of the Uniform Commercial Code Upon Receivables Financing—Some Answers & Some Unsolved Problems*, 76 Harv.L.Rev. 1529, 1547 (1963). When accounts of a going business are collected, the proceeds for the most part are normally used to purchase new inventory and to pay the expenses of the business; when inventory is sold, new accounts are generated. Coogan & Gordon, *supra*, at 1547. This kind of financing has been analogized to the flow of a river. *See, e.g., Grain Merchants*, 408 F.2d at 215; Henson, *"Pro-*

ceeds" Under the Uniform Commercial Code, 65 Colum.L.Rev. 232, 234 (1965); Hogan, *Games Lawyers Play with the Bankruptcy Preference Challenge to Accounts & Inventory Financing*, 53 Cornell L.Rev. 553, 559–61 (1968). As accounts are collected and the proceeds returned to the business, the river is replenished. If the proceeds are not returned, the river dries up.

Here, the funds advanced by Commercial Credit were used to operate the beverage business and resulted in the creation of new accounts. If Commercial Credit had not factored the accounts, BIBCO would have had to collect them and would have had to use the proceeds to operate its business. The amounts collected by Commercial Credit would not have gone to Bank had the factoring not occurred; they would have been returned to BIBCO to serve as the working capital of the beverage business so long as it operated. That Bank after default would have been entitled to attach and collect current accounts (which indeed it did) does not affect this analysis. Bank would receive an unconscionable windfall if the Court were to award everything collected from account debtors over a *period of months* simply because payment passed through Commercial Credit's hands.

The magnitude of the windfall sought by Bank—and the degree of its unconscionability—is underlined by the fact that Commercial Credit factored thirty day accounts. Thus, it is reasonable to conclude that during the period at issue—from July 1 through September 1984—Allied's working capital turned over approximately three times. Under Bank's theory, it is entitled to recover three times the amount which at any one time was subject to its security interest.[8]

The appropriate measure of damages is the loss proximately caused by Commercial Credit's conversion. Bank is therefore entitled to recover only those sums which were retained by Commercial Credit and not returned to the beverage business. Bank may obtain that portion of the $60,000 in interest and commissions collected by Commercial Credit for accounts factored after July 1, 1984. By serving a writ of possession, Bank has already recovered the current accounts existing at the time it chose to exercise its rights.

### 3. Holder in Due Course Defense

Commercial Credit claims that it may not be held liable for conversion because it is a holder in due course of checks negotiated to it by account debtors and by BCI. A holder in due course is a holder who takes an instrument for value, in good faith, and without notice that it is overdue or dishonored or of any defense against or claim to it on the part of any person. Cal.Com.Code § 3302 (West 1964). A holder in due course takes an instrument free from all claims to it on the part of any person. *Id.* § 3305(1). Nothing in Article Nine limits the rights of holders in due course. *Id.* § 9309 (West Supp.1987). A holder in due course takes priority over an earlier security interest even though perfected, and filing under Article Nine does not constitute notice to holders in due course. *Id.*

Commercial Credit cites *Thorp Commercial Corp. v. Northgate Industries, Inc.*, 490 F.Supp. 197 (D.Minn.1980), *rev'd on other grounds*, 654 F.2d 1245 (8th Cir.1981) in support of its holder in due course defense. In that case, a secured party took a security interest in and filed a financing statement covering its debtor's accounts.

---

**8.** As Bank's counsel has pointed out, double recovery is sometimes awarded under Article Nine. Section 9306(2) provides that a security interest continues in collateral after a transfer and in proceeds from the transfer in the hands of the debtor. A secured party may recover *both* proceeds from the debtor and replevin of the collateral or conversion damages from the transferee. *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (11th Cir.1985); *see* Hawkland, *The Proposed Amendments to Article Nine of the UCC Part II: Proceeds*, 77 Com.L.J. 12, 14 (1972). Thus, if Bank had asserted its rights immediately after default by Allied, it might have collected the accounts assigned to Commercial Credit, *see* Cal.Com.Code § 9502(1) (West Supp.1987) and could have taken possession of identifiable proceeds from the assignment of the accounts in Allied's bank account. This indeed is what occurred when Bank later did declare a default and took possession of the collateral.

A subsequent secured party also took a security interest in the debtor's accounts and advanced the debtor funds under a revolving line of credit. The debtor repaid the advances by endorsing and forwarding account debtors' checks to the junior secured party. The district court stated in dicta that the junior secured party would be entitled to assert its holder in due course status as a defense to liability to the senior secured party, if the junior secured party could show it did not have notice of the senior security interest. *Id.* at 204.

In a similar case, a debtor which had assigned accounts as security to a bank induced an account debtor to pay with a promissory note. *Citizens Valley Bank v. Pacific Materials Co.,* 263 Or. 557, 503 P.2d 491 (1972). The Oregon Supreme Court held that a holder in due course to whom the debtor negotiated the note had priority over the bank's interest under § 9–309.

■ These cases are distinguishable. In *Thorp* and *Citizens Valley* the secured parties asserted an interest in the instruments themselves. In *Thorp,* for example, the senior secured party claimed that the junior secured party had converted checks which were proceeds of the debtor's accounts. 490 F.Supp. at 200. The junior secured party never took an assignment of the accounts, and the senior secured party therefore never claimed that the junior secured party had converted the accounts. Bank's conversion claim is not based on an interest in the checks negotiated to Commercial Credit. Rather, the claim is to the value of the accounts Commercial Credit converted by accepting the checks as payment. Commercial Credit is liable not because it is deemed to have had knowledge of an interest in the negotiable instruments, *cf.* Cal.Com.Code § 9309, but because it had constructive knowledge of the Bank's interest in the accounts. The holder in due course rule is therefore not a defense to Commercial Credit's liability.[9]

This result is compelled by the rule that the liability of a transferee of collateral for conversion is not defeated by his status as a purchaser in good faith for value. *See United States v. Burnette-Carter Co.,* 575 F.2d 587, 588 (6th Cir.), *cert. denied,* 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978); Nickles, *supra,* at 524–25. This rule would be a dead letter if the transferee could assert the holder in due course rule as a defense.

### C. *Conclusion.*

Commercial Credit is liable to Bank for all interest and commissions collected for BIBCO accounts factored after July 1, 1984. Commercial Credit is directed forthwith to submit to Bank and the Court a proposed judgment conforming to this opinion, accompanied by a statement reflecting the manner of calculation and the supporting data used. Commercial Credit shall give Bank access to the books, records, and other data necessary to confirm the accuracy of the calculation.

IT IS SO ORDERED.

---

**9.** It is therefore not necessary to resolve the issue of whether Commercial Credit had notice of the Bank's interest.