852 F.2d 1162
 6 UCC Rep.Serv.2d 602
 BANK OF THE WEST, a California banking corporation,
Plaintiff-Appellant/Cross-Appellee,
v.
COMMERCIAL CREDIT FINANCIAL SERVICES, INC., a California
corporation, Defendant-Appellee/Cross-Appellant.
 Nos. 87-1940, 87-1984.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1988.
Decided July 26, 1988.
 
 Gary Nemer, Buchalter, Nemer, Fields & Younger, San Francisco, Cal., for plaintiff-appellant/cross-appellee.
 Mark R. Reiff, Taylor & Stanley, San Francisco, Cal., for defendant-appellee/cross-appellant.
 Appeals from the United States District Court for the Northern District of California.
 Before FARRIS, BRUNETTI and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 In these cross-appeals, Bank of the West, a California banking corporation ("Bank of the West" or "Bank"), and Commercial Credit Financial Services, Inc., a Delaware corporation ("CCFS"),[1] appeal the district court's judgment for Bank of the West on its suit for conversion of collateral. Bank of the West argues that (1) the district court's findings of fact are erroneous, (2) the court improperly excluded certain evidence, (3) the damages awarded are inadequate as a matter of law, and (4) the court erred in not considering the Bank's fraudulent conveyance claim. On its cross-appeal, CCFS argues the court incorrectly resolved the priority dispute between it and Bank of the West. CCFS contends that had the court applied the correct rule to the priority dispute, the court would have concluded CCFS did not convert the collateral.
 
 
 2
 We have jurisdiction under 28 U.S.C. Sec. 1291. Although the district court's findings of fact are not clearly erroneous, we conclude that the court erred in resolving the conflicting claims to the collateral. Consequently, we hold that CCFS prevails on its cross-appeal, and we do not reach Bank of the West's damages and fraudulent conveyance arguments. We reverse the decision of the district court and remand the case for entry of judgment in favor of CCFS.I
 
 STANDARD OF REVIEW
 
 3
 At the core of this case is a dispute between two creditors of different debtors. Each creditor claims a perfected security interest in the same collateral. To resolve this dispute, we must apply the provisions of the California Commercial Code. Bank of the West argues that our review of the district court's judgment is de novo, citing our decision in Buttonwillow Ginning Co. v. Federal Crop Ins. Corp., 767 F.2d 612 (9th Cir.1985). The Buttonwillow Ginning case does not stand for the broad proposition that we review de novo the entirety of a district court's decision involving a priority dispute between secured creditors. In the Buttonwillow Ginning case, we faced the question whether federal law requires a secured creditor to take some action other than to perfect its security interest under applicable state law before it may collect insurance proceeds payable to the debtor by the Federal Crop Insurance Corporation. In that case, neither party disputed the underlying facts. Consequently, the district court had only to apply applicable federal law, and we reviewed that legal question de novo. Id. at 613.
 
 
 4
 The district court's choice and application of the appropriate commercial code provision in the present case to resolve the priority dispute involves legal questions subject to our de novo review. But the district court does not apply the commercial code in a vacuum; it first must determine the facts surrounding the controversy. We review these findings of fact for clear error. See Fed.R.Civ.P. 52(a); United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We will affirm the district court's findings of fact unless we are " 'left with a definite and firm conviction that a mistake has been committed.' " Id. at 1201 (quoting Pullman-Standard v. Swint, 456 U.S. 273, 285 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982)). Once we are satisfied that the historical facts have been established without clear error, the choice of the applicable rule of law to resolve the dispute and its application to the facts present issues of law subject to de novo review. See id. at 1201-03.
 
 II
 FACTS
 
 5
 The district court's well-written opinion contains a thorough discussion of the complicated facts of this case. See Bank of the West v. Commercial Credit Fin. Servs., Inc., 655 F.Supp. 807, 810-12 (N.D.Cal.1987). In its opinion, the court thoughtfully analyzed the evidence presented by both sides and meticulously set forth the events preceding this appeal in a chronological table accompanied by crossreferences to those portions of the record favoring each party. We have independently examined the substantial record on appeal. After this review, we are not left with a "firm and definite conviction" that the district court's findings of fact are erroneous. Accordingly, we adopt the district court's findings of fact and set out below a summary of those events pertinent to the issues on appeal.
 
 
 6
 On April 5, 1982, Bank of the West entered into a loan and security agreement with Allied Canners & Packers, Inc. ("Allied"), a wholly-owned subsidiary of Boles World Trade Corporation ("BWTC"). Bank of the West lent Allied $4,000,000 in exchange for a security interest in Allied's present and future-acquired inventory, accounts, and proceeds. The Bank perfected its security interest by filing a financing statement with the California Secretary of State on April 7, 1982.
 
 
 7
 In 1983, Allied's financial condition deteriorated and the Bank demanded repayment of the outstanding loan balance of $1,800,000. Allied persuaded the Bank to renegotiate the loan. This resulted in a restructuring agreement signed on January 13, 1984. Contemporaneously with the restructuring agreement, Allied signed a new security agreement granting Bank of the West a security interest in Allied's "present and hereafter acquired" accounts, inventory, and proceeds. As part of the loan renegotiations, there is evidence that BWTC suggested to Bank of the West that it would transfer a beverage wholesaling and importing business to Allied. See Bank of the West, 655 F.Supp. at 811.
 
 
 8
 In January 1984, another wholly-owned BWTC subsidiary, Boles & Co., Inc. ("BCI"), entered into a factoring agreement with CCFS. The factoring agreement provided that BCI would assign its accounts to CCFS. CCFS would then collect amounts due from account debtors; three days after collection, CCFS would remit to BCI the amounts collected, less a 1% commission, and less any prior advances, plus interest. Advances were to be made on accounts which remained uncollected 33 days following assignment. In the factoring agreement, BCI granted CCFS a security interest in its present and after-acquired accounts. In a separate security agreement to secure advances made to BCI pending collection of accounts, BCI also granted CCFS a security interest in BCI's present and after-acquired inventory and proceeds. CCFS properly perfected its security interests by filing a financing statement with the California Secretary of State on January 5, 1984.
 
 
 9
 To understand the issues on appeal, it is necessary to consider the complicated corporate structure of the affiliated companies owned by BWTC. BWTC, formerly called Boles & Co., Inc., owned several subsidiary corporations, which engaged in several different businesses. Before August 1983, the former Boles & Co. (now called BWTC) conducted a beverage importing and wholesaling business. On August 15, 1983, the board of directors of the original Boles & Co. voted to change its name to BWTC and to contribute the beverage business to one of its wholly-owned subsidiaries, Minerals Trading Corporation. On the same day, the directors of Minerals voted to change its name to Boles & Co., Inc. (referred to as BCI), and to accept the contribution of the beverage business assets from BWTC. Between August 1983 and June 30, 1984, BWTC again reorganized its subsidiaries and transferred the beverage business from BCI to Allied. Allied changed its name to Boles International Beverage Co. ("Allied/BIBCO") by vote of its board of directors on December 6, 1983, but did not file a certificate of amendment with the California Secretary of State to reflect this name change until June 11, 1984.
 
 
 10
 Much of the dispute in this case is over who owned the beverage business accounts factored by CCFS after January 13, 1984, the date on which Bank of the West signed the loan restructuring agreement with Allied/BIBCO. Bank of the West argues that at least by February 1, 1984, Allied/BIBCO was conducting the beverage business and that CCFS consequently was factoring accounts in which Bank of the West held a prior perfected security interest. The district court found that the beverage business was not finally transferred to Allied/BIBCO until July 1, 1984. See Bank of the West, 655 F.Supp. at 814-15. The court reviewed the extensive evidence presented by both sides and found that while BWTC may have intended to transfer the beverage business to Allied as early as October 1983, id. at 814, BWTC did not complete moving the beverage business to Allied/BIBCO until the end of June 1984. Id. at 815. Having examined the record, which is replete with conflicting testimony, vague assertions, and confused recollections, we cannot say that the district court's findings of fact are clearly erroneous. Accordingly, we accept the court's finding that between January 13 and June 30, 1984, BCI owned and operated the beverage business.[2] In operating that business, BCI generated the accounts factored by CCFS.[3] On July 1, 1984, the beverage business was transferred to Allied/BIBCO. Consequently, from and after that date, any accounts factored by CCFS were generated by sales of the beverage business inventory by Allied/BIBCO, or were accounts in existence at the time of the transfer.
 
 III
 ANALYSIS
 
 11
 The principal issue on appeal is the application of the California Commercial Code to determine which of two conflicting security interests[4] in the beverage business's accounts has priority. As the district court explained in its opinion, resolving conflicting claims to the same collateral requires a three-step inquiry. Bank of the West, 655 F.Supp. at 813. The first step is to determine whether each security interest has "attached," and therefore become enforceable. See Cal.Com.Code Sec. 9203(1). Attachment occurs when each of three events has taken place: (1) the secured party has possession of the collateral pursuant to an agreement, or the debtor has signed a security agreement describing the collateral, (2) the secured party has given value, and (3) the debtor has rights in the collateral. Id.
 
 
 12
 The second step in the analysis is to classify each of the competing security interests as "perfected," id. Sec. 9303(1), or as "unperfected." Perfection requires "attachment" of the security interest plus some additional step specified in the code. Id. In general, a security interest which has "attached" is "perfected" by filing a financing statement, id. Sec. 9302(1), which complies with certain formal requisites, see id. Sec. 9402(1), and is filed in the proper place. Id. Sec. 9401(1). Once the competing security interests have been classified, the final step is to apply the priority rules set out in chapter 3 of Division 9 of the California Commercial Code. See id. Secs. 9301-9318.
 
 
 13
 The collateral claimed by both CCFS and Bank of the West consists of accounts generated from the sale of the beverage business's inventory after the transfer of the beverage business from BCI to Allied/BIBCO. The district court found that the "transfer" of the beverage business to Allied/BIBCO was effected by a process that ended by July 1, 1984. Bank of the West, 655 F.Supp. at 814-15. We already have said that this finding of fact is not erroneous. Consequently, the dispute is over those accounts factored between July 1, 1984 and October 15, 1984, the date on which the factoring agreement terminated. Id. at 812. To understand the resolution of the priority dispute that we adopt in this opinion, it is necessary to consider the status of the parties' security interests before the transfer of the beverage business.
 
 
 14
 A. The Pre-Transfer Security Interests in the Beverage Business
 
 1. The Bank's Security Interest
 
 15
 Until completion of the transfer on July 1, 1984, Bank of the West had no enforceable security interest in the beverage business's inventory or accounts. Bank of the West's debtor is Allied/BIBCO. A security interest cannot attach unless "the debtor has rights in the collateral." Cal.Com.Code Sec. 9203(1)(c). The district court specifically found that Allied/BIBCO did not acquire rights in the collateral until the transfer of the beverage business. Bank of the West, 655 F.Supp. at 814. Consequently, Bank of the West had no security interest in the accounts factored by CCFS under its agreement with BCI until the July 1, 1984 transfer.
 
 2. CCFS' Security Interest
 
 16
 From January 10, 1984 to July 1, 1984, CCFS had a perfected security interest in BCI's inventory, accounts, and proceeds. On January 10, 1984, BCI signed two agreements (the factoring agreement and the separate security agreement) granting CCFS security interests in BCI's present and future-acquired inventory, accounts, and proceeds. CCFS gave "value" to BCI by promising to advance it money on the strength of the accounts assigned under the factoring agreement. See Cal.Com.Code Sec. 1201(44). The district court specifically found that BCI had "rights in the collateral." Bank of the West, 655 F.Supp. at 813. Thus, CCFS's security interest attached to the pre-transfer collateral on January 10, 1984. Cal.Com.Code Sec. 9203(1); Bank of the West, 655 F.Supp. at 813. CCFS filed a financing statement naming BCI as its debtor with the California Secretary of State on January 5, 1984. As a result, CCFS's security interest became perfected on January 10, 1984, the date on which its security interest in the collateral attached. See Cal.Com.Code Sec. 9303(1) ("If such [applicable] steps [required for perfection] are taken before a security interest attaches, it is perfected at the time when it attaches."); see also id. Comment 1 ("If the steps for perfection have been taken in advance (as when the secured party files a financing statement before giving value or before the debtor acquires rights in the collateral), then the interest is perfected automatically when it attaches.").
 
 B. The Post-Transfer Security Interests
 1. The Bank's Security Interest
 
 17
 Bank of the West's security agreement with Allied granted the Bank a security interest in Allied's future-acquired inventory, accounts, and proceeds. As we have stated, Bank of the West's security interest attached to the transferred assets on July 1, 1984, when its debtor, Allied, acquired rights in the collateral. See Cal.Com.Code Sec. 9203(1). Bank of the West's security interest became perfected at the moment of attachment as a result of the Bank's financing statement naming Allied as its debtor, which was filed with the California Secretary of State on April 7, 1982. See id. Sec. 9303(1). In addition to its perfected security interest in assets actually transferred from BCI to Allied, because of the after-acquired property clause in its security agreement, Bank of the West had a perfected security interest in all inventory, accounts, and proceeds thereafter acquired by Allied.[5]
 
 2. CCFS's Security Interest
 
 18
 In its opinion, the district court concluded that it was unnecessary for it to determine whether CCFS's security interest remained perfected after the transfer. Bank of the West, 655 F.Supp. at 814. In light of our resolution of the priority dispute, we must address this question.
 
 
 19
 Two provisions of the commercial code are relevant to deciding whether CCFS's security interest continued after the transfer of the beverage business to Allied. We begin with section 9306(2), which provides in pertinent part:
 
 
 20
 Except where this division ... otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
 
 
 21
 Cal.Com.Code Sec. 9306(2). Neither the factoring agreement nor the related security agreement expressly authorized BCI to transfer its assets to another corporation. There is no evidence to show that CCFS otherwise authorized this disposition of its collateral. California courts have made clear that implied authorizations of sales of the debtor's collateral will not be found absent clear evidence based on the prior conduct of the parties. E.g., Producers Cotton Oil Co. v. Amstar Corp., 197 Cal.App.3d 638, 646, 242 Cal.Rptr. 914, 918 (1988). Because there is no evidence that CCFS authorized BCI's disposition of the collateral, CCFS's security interest in the collateral actually transferred (inventory and accounts) and its proceeds continued after the transfer. See Towers v. B.J. Holmes Sales Co., Inc. (In re West Coast Food Sales, Inc.), 637 F.2d 707, 708 (9th Cir.1981).
 
 
 22
 While section 9306(2) indicates that a security interest survives an unauthorized disposition of the collateral, we must look to section 9402(7) of the commercial code to determine whether CCFS's security interest in the collateral remained perfected after the transfer. See Burke, The Duty to Refile Under Section 9-402(7) of the Revised Article 9, 35 Bus.Law. 1083, 1088-89, 1092 (1980); Coogan, The New UCC Article 9, 86 Harv.L.Rev. 477, 527 (1973); Westbrook, Glitch: Section 9-402(7) and the U.C.C. Revision Process, 52 Geo.Wash.L.Rev. 408, 414-15 (1984).
 
 
 23
 A financing statement sufficiently shows the name of the debtor if it gives the individual partnership or corporate name of the debtor, whether or not it adds other trade names or names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement or an appropriate amendment to the filed financing statement is filed before the acquisition of collateral by the debtor. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.
 
 
 24
 Cal.Com.Code Sec. 9402(7) (emphasis added).
 
 
 25
 On its face, section 9402(7) seems to answer the issue posed by the transfer from BCI to Allied simply enough. Under the third sentence of section 9402(7), CCFS's security interest in the collateral actually transferred by BCI to Allied remains perfected. This is the collateral "transferred by the debtor" to which the third sentence of 9402(7) speaks. Section 9306(2) says CCFS's security interest follows its collateral. The last sentence of section 9402(7) says CCFS's filed financing statement remains effective. By necessary implication, CCFS's security interest therefore remains perfected. The more difficult question to answer, however, is whether CCFS has any interest in collateral acquired by Allied after the transfer. At first blush, the answer is no. After the transfer, any collateral acquired by Allied is not collateral acquired by CCFS's "debtor." See, e.g., Cal.Com.Code Sec. 9105(1)(d) (" 'Debtor' means the person who owes payment or other performance of the obligation secured, whether or not he or she owns or has rights in the collateral, and includes the seller of accounts or chattel paper."). If the accounts generated after the transfer are not collateral acquired by CCFS's debtor, it would appear that CCFS cannot claim any security interest in the post-transfer accounts, except to the extent that these accounts are traceable as proceeds of the transferred inventory, in which CCFS had a perfected security interest that followed the transfer under sections 9306(2) and 9402(7).
 
 
 26
 If we were to read section 9402(7) this rigidly we would overlook a difficult problem that commentators have observed. There are a number of transactions that involve both a transfer of collateral and a change in the corporate identity or structure of the debtor. See, e.g., Knippenberg, Debtor Name Changes and Collateral Transfers Under 9-402(7): Drafting from the Outside-In, 52 Mo.L.Rev. 58, 108 (1987) ("It is not always an easy matter, however, to decide whether the activity of an entity debtor should be regarded as a change of identity or corporate structure on the one hand, or a transfer of collateral on the other." (footnote omitted)); Note, Debtors' Name or Identity Changes: Distributing Benefits and Burdens Under Article 9, 31 Hastings L.J. 959, 979 (1980) ("[G]iven the various potential forms of transfers, it may be difficult to distinguish between dispositions of collateral to independent third parties and to successor enterprises of the debtor."). In the present case, assets have been transferred from one wholly-owned subsidiary of a common parent corporation to another wholly-owned subsidiary. There is no evidence that the transferor, BCI, received any consideration for the transfer of the beverage business. The evidence suggests that the transaction represented a simple bookkeeping entry from the perspective of the parent corporation. See Bank of the West, 655 F.Supp. at 811. There is no evidence that the beverage business was conducted differently after the transfer. Indeed, until mid-August 1984, Allied continued to use invoices and transfer lists bearing the BCI name. There also is testimony in the record indicating that "there was confusion among BWTC personnel as to which company operated the beverage business [before the transfer]." Id. at 812. In sum, the "transfer" of collateral in this case involves a change in the corporate structure of the debtor.
 
 
 27
 Comments 7 and 8 to section 9-402(7) of the Uniform Commercial Code, which California has adopted almost unchanged, read as follows:
 
 
 28
 7....
 
 
 29
 Subsection (7) also deals with the case of a change of name of a debtor and provides some guidelines when mergers or other changes of corporate structure of the debtor occur with the result that a filed financing statement might become seriously misleading. Not all cases can be imagined and covered by statutes in advance; however, the general principle sought to be achieved by the subsection is that after a change which would be seriously misleading, the old financing statement is not effective as to new collateral acquired more than four months after the change, unless a new appropriate financing statement is filed before the expiration of the four months. The old financing statement, if legally still valid under the circumstances, would continue to protect collateral acquired before the change and, if still operative under the particular circumstances, would also protect collateral acquired within the four months. Obviously, the subsection does not undertake to state whether the security agreement continues to operate between the secured party and the party surviving the corporate change of the debtor.
 
 
 30
 8. Subsection (7) also deals with a different problem, namely whether a new filing is necessary where the collateral has been transferred from one debtor to another. This question has been much debated both in pre-Code law and under the Code. This Article now answers the question in the negative. Thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it.
 
 
 31
 Cal.Com.Code Sec. 9402(7) Uniform Commercial Code Comments 7 & 8 (emphasis added).
 
 
 32
 These comments make clear that the second and third sentences of 9402(7) are meant to apply in different circumstances.[6] The drafters, however, do not explain how courts are to decide whether an intercorporate transfer unaccompanied by a formal structural change such as a merger of the related entities is a "change of identity or structure" or a "transfer of collateral." This clearly is not a simple matter to resolve. But in this case, we conclude that there has been a change of structure in the debtor entity.
 
 
 33
 To reach this conclusion, we return to the Code's definition of "debtor," which provides that "[w]here the debtor and the owner of the collateral are not the same person, 'debtor' means the owner of the collateral in any provision of the division dealing with the collateral, ... and may include both where the context so requires." Cal.Com.Code Sec. 9105(1)(d). Comment 2 to this section explains that "[o]ccasionally, one person furnishes security for another's debt, and sometimes property is transferred subject to a secured debt of the transferor which the transferee does not assume; in such cases, the term 'debtor' may, depending upon the context, include either or both such persons." Id. Uniform Commercial Code Comment 2 (emphasis added). We already have seen that under section 9306(2), a security interest follows collateral into the hands of the transferee when the transferor's disposition of the collateral was not authorized. It seems reasonable to read the term "debtor" in the second sentence of section 9402(7) to mean not only the transferee, but also to include the transferor, especially when the transferor and transferee are wholly-owned subsidiaries of a common parent and the transfer occurs under the circumstances existing in the present case.
 
 
 34
 Our conclusion to treat the intercorporate transfer between BCI and Allied/BIBCO as a change in BCI's corporate structure also finds support in our decision in Towers v. B.J. Holmes Sales Co. (In re West Coast Food Sales, Inc.), 637 F.2d 707 (9th Cir.1981). In that case, the creditor, B.J. Holmes Sales Co., lent money to John Granaham d/b/a West Coast Sales Co. in exchange for a security interest in the debtor's accounts. B.J. Holmes filed a financing statement naming "West Coast Sales Company" as its debtor. Later, a newly formed entity, West Coast Food Sales, Inc., succeeded to the assets and liabilities of West Coast Sales Company. B.J. Holmes continued to lend money to West Coast Food Sales, Inc. until June 1, 1977, when that corporation filed a bankruptcy petition. The trustee in bankruptcy challenged B.J. Holmes' security interest in the accounts generated after the incorporation of West Coast Food Sales, Inc. and the transfer of the assets and liabilities of West Coast Sales Co. to it in 1973. The trustee argued that the newly formed entity was not B.J. Holmes' debtor and the security agreement with West Coast Sales Co. did not bind West Coast Food Sales, Inc. We rejected the trustee's argument because we found it repugnant to allow "a debtor ... to evade the obligations of a validly executed security agreement by the simple expedient of an alteration in its business structure." Id. at 709. We noted that the business was operated similarly before and after the change in corporate structure and that ownership of the two entities remained in the same hands before and after the transfer. Id.
 
 
 35
 The rationale of the West Coast Food Sales case applies to the intercorporate transfer between BCI and Allied. We will not validate an attempt by BWTC to switch assets among its affiliated, wholly-owned subsidiaries so that the debt to Bank of the West is satisfied at the cost of CCFS's perfected secured claim against the beverage business's assets. "A debtor cannot destroy the perfected security interest of a secured party by merely changing its name or corporate structure...." Id. (quoting Inter Mountain Ass'n of Credit Men v. Villager, Inc., 527 P.2d 664, 671 (Utah 1974)); see also AC-Delco Div. of Gen. Motors Corp. v. Serrins Automotive Warehouse, Inc. (In re Serrins Automotive Warehouse, Inc.), 18 B.R. 718, 719 (Bankr.W.D.Pa.1980) (citing cases stating that debtor cannot destroy perfected security interest by transferring title to collateral or changing its name or corporate structure, "and the validity of the lien against subsequently acquired assets as well as those presently owned is effective thereagainst"); American Heritage Bank & Trust Co. v. O. & E., Inc., 40 Colo.App. 306, 308, 576 P.2d 566, 568 (1978) (same).
 
 
 36
 In summary, we hold that when BCI transferred its assets to Allied, this was not a bona fide third party transfer of collateral within the scope of the third sentence of section 9402(7). Rather, BCI simply changed its corporate structure. When the transferor shifts assets to an affiliated company at the behest of their common parent company, and when the transaction has the same effect as a merger of the transferor into the transferee with the transferee as the surviving corporation, we cannot say that this is a simple transfer of collateral. To hold otherwise would permit debtors to decide which sentence of section 9402(7) applies merely by choosing an advantageous formal arrangement for the desired transaction. Thus, applying the second sentence of section 9402(7), we hold that CCFS's security interest continued perfected in those assets actually transferred to Allied as well as in those assets acquired by Allied during the four months following the July 1, 1984 transfer. Because the only collateral at issue in this case consists of those accounts factored in the 3 1/2-month period between July 1, 1984, and October 15, 1984, we need not consider whether the BCI-Allied transaction rendered CCFS's filed financing statement seriously misleading.
 
 C. Resolving the Priority Dispute
 
 37
 Having concluded that both Bank of the West and CCFS had perfected security interests in the inventory and accounts actually transferred from BCI to Allied/BIBCO, as well as the inventory and accounts acquired by Allied/BIBCO after the July 1, 1984 transfer, we must decide which of these security interests is entitled to priority. The district court resolved this question by looking to section 9312(5), which provides:
 
 
 38
 In all cases not governed by other rules stated in this section ... priority between conflicting security interests in the same collateral shall be determined according to the following rules:
 
 
 39
 (a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
 
 
 40
 (b) So long as conflicting security interests are unperfected, the first to attach has priority.
 
 
 41
 Cal.Com.Code Sec. 9312(5).
 
 
 42
 By applying section 9312(5)(a) according to its literal language, the district court concluded that Bank of the West's security interest prevailed over that of CCFS. When BCI transferred the beverage business to Allied/BIBCO, Bank of the West's security interest attached under the after-acquired property clause in its security agreement. See Cal.Com.Code Secs. 9203(1), 9204(1). When Bank of the West's security interest attached, it automatically became perfected pursuant to the earlier filed financing statement naming Allied as its debtor. See Cal.Com.Code Sec. 9303(1). Bank of the West's financing statement was filed on April 7, 1982. CCFS's financing statement was filed January 5, 1984, and its security interest became perfected on January 10, 1984 when BCI executed the factoring and related security agreements. Section 9312(5) sets forth a "first to file or first to perfect" rule of priority. Because Bank of the West's financing statement was filed first, the district court concluded that the Bank's security interest prevailed over that of CCFS. Bank of the West, 655 F.Supp. at 817.
 
 
 43
 The situation we have described above has until this case been regarded by the commentators as only a hypothetical scenario. It is a scenario offered by the commentators, however, to illustrate a failure of the commercial code to resolve a priority dispute properly. See, e.g., B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code p 3.8 (1980); Harris, The Interaction of Articles 6 and 9 of the Uniform Commercial Code: A Study in Conveyancing, Priorities, and Code Interpretation, 39 Vand.L.Rev. 179, 222-25, 225 n. 182 (1986); Oldfather, Floor Plan Financing Under Article 9 of the Uniform Commercial Code, 14 U.Kan.L.Rev. 571, 582-84 (1966); Skilton, Security Interests in After-Acquired Property Under the Uniform Commercial Code, 1974 Wis.L.Rev. 925, 948. The difficulty noted by these commentators is this: Before the transfer from BCI to Allied, CCFS (the transferor's creditor) had a perfected security interest in the collateral. After the transfer, CCFS's perfected security interest suddenly is subordinated to the perfected security interest of Bank of the West (the transferee's creditor). CCFS, which had taken all steps required of it by the commercial code to announce its interest in the collateral to potential creditors of the transferor (BCI), now finds its security interest subordinated to that of the transferee's (Allied's) creditor, (Bank of the West), whose security interest came into play only because BCI made an unauthorized disposition of the collateral to which the Bank's security interest attached solely by operation of an after-acquired collateral clause. See B. Clark, supra, p 3.8, at 3-53; Harris, supra, 39 Vand.L.Rev. at 222-25.
 
 
 44
 We agree with the commentators that applying section 9312(5) to resolve this priority dispute produces an unsatisfactory result. The principal reason that section 9312(5) fails to produce a proper result is that it does not appear the drafters contemplated what Professor Clark calls the "dual debtor dilemma." See B. Clark, supra, p 3.8. Certainly the official comments to the Uniform Commercial Code, which offer several illustrations of the operation of section 9312(5), do not address the situation in which the competing security interests are between creditors of different debtors. See Cal.Com.Code Sec. 9312 Uniform Commercial Code Comments 4-8. In Mr. Coogan's seminal article, The New UCC Article 9, 86 Harv.L.Rev. 477 (1973), no mention of the dual debtor scenario is made in the thoughtful portion of the article addressing the drafters' reasons for adopting section 9312(5). See id. at 507-11. Because section 9312(5) does not contemplate the dual debtor scenario, we must resolve this priority dispute by returning to first principles.
 
 
 45
 As a general rule of construction, the commercial code "shall be liberally construed and applied to promote its underlying purposes and policies." Cal.Com.Code Sec. 1102(1). The commercial code is intended to be flexible. "It is intended to make it possible for the law embodied in this Act to be developed by the courts in the light of unforeseen and new circumstances and practices. However, the proper construction of the Act requires that its interpretation and application be limited to its reason." Id. Uniform Commercial Code Comment 1. There are two reasons behind the rule of section 9312(5)(a). First, the "first to file or first to perfect" rule serves to modify the common law notion of "first in time, first in right." Harris, supra, 39 Vand.L.Rev. at 222. Section 9312(5) places a premium on prompt filing of financing statements as a means of protecting future creditors of the debtor. The financing statement alerts potential creditors that collateral against which they are contemplating making a loan already is encumbered. Thus, section 9312(5)(a) penalizes a creditor who has a security interest but who does not promptly file a financing statement by awarding priority to a later creditor who acquires a security interest in the same collateral and who more promptly files a financing statement. The "first to file or first to perfect" rule of 9312(5)(a) thus addresses the problem of secret security interests that so concerned pre-Code courts. See id. But in the present case, the notice giving function of 9312(5)(a) does not apply. Bank of the West is a creditor of another debtor entity, and the Bank's interest in the collateral arises solely out of an after-acquired property clause. Bank of the West cannot claim that it has relied to its detriment on the absence of a filed financing statement by CCFS.[7]
 
 
 46
 A second purpose behind section 9312(5)(a) is an implied commitment to a secured creditor who has filed a financing statement that, absent special considerations such as a purchase money security interest, see, e.g., Cal.Com.Code Sec. 9312(3), (4), no subsequent creditor will be able to defeat the complying creditor's security interest. This notion finds support in comment 5 to section 9402(7), which reads in pertinent part: "The justification for this rule lies in the necessity of protecting the filing system--that is, of allowing the secured party who has first filed to make subsequent advances without each time having, as a precondition of protection, to check for filings later than his." Cal.Com.Code Sec. 9312 Uniform Commercial Code Comment 5; see also Harris, supra, 39 Vand.L.Rev. at 223-24 (discussing same). This has been described as the "claim staking" function of the financing statement. See Knippenberg, supra, 52 Mo.L.Rev. at 61 & n. 22. What this means is that by filing a proper financing statement in the proper place, a secured creditor has staked a claim to its collateral and knows that, absent special considerations, its claim will prevail against subsequently arising interests in the same property. By complying with the Code, the creditor is relieved of much of the responsibility of monitoring its debtor's collateral--the Code has allocated the burden of discovering prior filed financing statements to later lenders. Cf. Cal.Com.Code Sec. 9402 Uniform Commercial Code Comment 8 ("[A]ny person searching the condition of ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if the circumstances seem to require it.").
 
 
 47
 Applying section 9312(5)(a) to the present case serves neither of the rationales behind the "first to file or first to perfect" rule. The notice giving function is irrelevant because the creditor of a different debtor whose sole interest in disputed collateral arises from an after-acquired property clause has no incentive to check for financing statements against the property of another debtor. Certainly the burden is on a transferee's creditor to search the title to property, but this duty arises only when the transferee's creditor first appears on the scene after the transfer. Likewise, it makes no sense to use section 9312(5)(a) to defeat CCFS's perfected security interest when CCFS has taken all steps required of it by the Code to proclaim its interest in the collateral. CCFS is entitled to rely on the Code's promise that a creditor who fully complies usually may expect its security interest to be given priority in a dispute with another secured creditor. To apply section 9312(5)(a) to this case would produce an undesirable result that does not follow from the principles that the section is meant to promote.[8]
 
 
 48
 We think the correct result is reached in this case by applying the common sense notion that a creditor cannot convey to another more than it owns. Put another way, the transferee, Allied, cannot acquire any greater rights in the beverage business's assets than its transferor, BCI, had in them. Cf. Cal.Com.Code Sec. 2403(1) ("A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased."); see also B. Clark, supra, p 3.8 (suggesting principles of section 2403(1) apply to this situation); Harris, supra, 39 Vand.L.Rev. at 223, 225 n. 182 (same). Our analysis also finds direct support in the California Commercial Code. Section 9312(1) provides, "The rules of priority stated in other sections of this chapter ... shall govern where applicable." And section 9306(2) provides that a security interest follows collateral into the hands of a transferee when there is an unauthorized disposition by the transferor. See P. Coogan, W. Hogan, D. Vagts & J. McDonnel, Secured Transactions under the Uniform Commercial Code Sec. 7.11A[p]. The drafters tell us that "[i]n most cases when a debtor makes an unauthorized disposition of the collateral, the security interest, under ... this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, ... the transferee takes subject to the security interest.... Subsection [9306(2) ] codifies this rule." Cal.Com.Code Sec. 9306(2) Uniform Commercial Code Comment 3. If the transferee (Allied) takes the transferred collateral subject to the transferor's creditor's (CCFS's) security interest, certainly the transferee's creditor (Bank of the West) can have no greater rights in the collateral than does its debtor (Allied). Because section 9402(7) preserves CCFS's perfected security interest in the collateral actually transferred as well as in the property acquired in the four months after the transfer, CCFS's security interest continues to be superior to Bank of the West's interest during this period, even though Bank of the West's interest also is perfected. This result is consistent with the principles of the filing system that we have previously discussed. If the notice giving function does not apply because Bank of the West has no reason to check for filings against BCI, the claim-staking function that protects CCFS should be enforced. CCFS has done all that the Code asks of it to protect its interest. Absent some countervailing consideration, CCFS should be entitled to rely on its perfected security interest.
 
 IV
 CONCLUSION
 
 49
 BCI's transfer of the assets subject to CCFS's security interest was an unauthorized disposition of the collateral. Consequently, applying section 9306(2), CCFS's security interest followed the transferred assets into the hands of Allied. Because the transfer was in reality a change in corporate structure, CCFS's security interest remained perfected in all assets actually transferred as well as in those acquired by Allied in the four months after the transfer. See Cal.Com.Code Sec. 9402(7) (second sentence). Because Allied/BIBCO's interest in the assets transferred and those acquired in the four months thereafter is subject to CCFS's security interest, see Cal.Com.Code Sec. 9306(2) Uniform Commercial Code Comment 3, Bank of the West can have no greater rights in the collateral than its debtor. Cf. Cal.Com.Code Sec. 2403(1). Therefore, CCFS's perfected security interest is superior to that of Bank of the West. Because Bank of the West's security interest is subordinate to that of CCFS, CCFS could not have converted Bank of the West's property when it factored the post-transfer account. As a result, we reverse the decision of the district court and remand the case for entry of judgment in favor of CCFS.
 
 
 50
 REVERSED AND REMANDED.
 
 
 
 [1]
 Although the case caption indicates that CCFS is a California corporation, CCFS in fact is a Delaware corporation. The error in the caption appears to have occurred as a result of the Bank's mistake when it originally commenced its action against CCFS in California state court and averred on information and belief that CCFS is incorporated in California. CCFS properly removed the suit against it to federal district court based on diversity of citizenship. See 28 U.S.C. Sec. 1441(a)
 
 
 [2]
 Bank of the West offered the declaration of Andrew Lomas, who became president of Allied and BCI in May 1984, to show that Allied owned and operated the beverage business before July 1984. The Lomas declaration purported to describe the contents of Allied's financial books and records. In his declaration, Lomas stated that Allied's records indicated that BWTC imported the beverage inventory and then transferred it to Allied, which then sold the inventory. See Bank of the West, 655 F.Supp. at 811 n. 5. The district court excluded those portions of the Lomas declaration that described the contents of Allied's financial records under the "best evidence" rule, which requires the original writing to be introduced into evidence when its contents are at issue, see Fed.R.Evid. 1002, unless the offering party satisfactorily accounts for the original writing's unavailability. Fed.R.Evid. 1004. We need not decide whether the district court abused its discretion in excluding this testimony. "On appeal, a ruling which ... excludes evidence, even if an abuse of discretion, will not be overturned if the error is harmless." Burgess v. Premier Corp., 727 F.2d 826, 833 (9th Cir.1984) (citing Fed.R.Civ.P. 61). In this case, the Lomas declaration was cumulative of other evidence rejected by the court, which also tended to show that Allied operated the beverage business before July 1984. Accordingly, even if the district court erred in excluding the Lomas declaration, the error was harmless
 
 
 [3]
 Bank of the West renews its argument that even if BCI "operated" the beverage business before July 1984, Allied "owned" the inventory used in that business, and hence Allied "owned" any accounts generated by the sale of that inventory. We reject this argument. The district court specifically found that BCI owned the collateral used in the beverage business, which necessarily included inventory. See Bank of the West, 655 F.Supp. at 814. This finding is not clearly erroneous
 
 
 [4]
 A "security interest" is "an interest in personal property or fixtures which secures payment or performance of an obligation." Cal.Com.Code Sec. 1201(37)
 
 
 [5]
 We note that there is evidence in the record that at the time of the July 1, 1984 transfer, Allied was a moribund entity that carried on no business of its own. Consequently, the only post-transfer property acquired by Allied related to the beverage business
 
 
 [6]
 Notwithstanding arguments to the contrary, we do not read the third sentence of section 9402(7) as simply stating a necessary conclusion from the second sentence. See, e.g., Note, supra, 31 Hastings L.J. at 984 ("[T]he last sentence appears to state merely what is evident from the second, i.e., that no new financing statement need be filed with respect to the security interest in the specific property transferred by the debtor to the successor enterprise." (emphasis in original)). We think that the drafters intended the third sentence to apply to bona fide transfers of collateral to third parties unrelated to the transferor. We note, of course, that section 9307(1), which provides that a transfer to a buyer in the ordinary course will cut off the transferor's creditor's security interest, does not apply in this case. This is so because Allied cannot qualify as a "buyer in the ordinary course." The transfer of all of BCI's assets to Allied as a matter of law is not in the ordinary course of business. See Cal.Com.Code Sec. 1201(9). The transfer of all of BCI's inventory to Allied is a bulk sale. See id. Sec. 6102. "Buying" does not include a bulk transfer. Id. Sec. 1201(9). Therefore, Allied, as a transferee in bulk, cannot defeat CCFS's security interest. See Bank of the West, 655 F.Supp. at 816. As we explain later in this opinion, if Allied cannot defeat CCFS's security interest, neither can Bank of the West
 
 
 [7]
 Indeed, there is evidence that as part of the restructuring agreement, the Bank agreed to subordinate its security interest to any institutional lender who financed the beverage business's accounts. CCFS gave BCI a subordination agreement to send the Bank when CCFS learned of the transfer. For reasons not clear in the record, the Bank did not execute the subordination agreement. The fact remains, however, that the Bank cannot argue that it was misled by the absence of a financing statement filed by CCFS
 
 
 [8]
 It is possible to argue, of course, that our analysis does violence to the interest of the transferee's creditor, whose security interest has been perfected by filing just the same as the transferor's creditor. But it is important to remember that the situation we consider is one in which the transferee's creditor's security interest attaches to the transferred collateral solely by operation of an after-acquired property clause. Although the Uniform Commercial Code expressly validates after-acquired property clauses, see Cal.Com.Code Sec. 9204(1), these "floating liens" still have not been whole-heartedly accepted by the drafters
 Subsection 1 makes clear that a security interest arising by virtue of an after-acquired property clause has equal status with a security interest in collateral in which the debtor has rights at the time value is given under the security agreement. That is to say: security interest in after-acquired property is not merely an "equitable" interest; no further action by the secured party ... is required. This does not mean however that the interest is proof against subordination or defeat....
 Cal.Com.Code Sec. 9204(1) Uniform Commercial Code Comment 1 (emphasis added). To the extent our opinion results in holders of after-acquired property clauses not being able to prevail against the perfected security interest of a transferor's secured creditor, this is consistent with the drafters intention in validating after-acquired property clauses but not granting them an assurance of absolute priority in all cases.
 For an excellent analysis of the monitoring burdens placed on creditors as they relate to the second sentence of section 9402(7) and after-acquired property clauses, see Knippenberg, supra, 52 Mo.L.Rev. at 92-97.